**J.B. HARALSON, et al.,**
**Plaintiffs–Appellees,**
**Cross–Appellants,**

v.

**The E.F. HUTTON GROUP, INC., et al., Defendants–Appellants,**
**Cross–Appellees.**

**The E.F. HUTTON GROUP, INC., et al., Plaintiffs–Appellants,**
**Cross–Appellees,**

v.

**George J. AUBIN, et al.,**
**Defendants–Appellees,**
**Cross–Appellants.**

No. 88–2999.

United States Court of Appeals,
Fifth Circuit.

Dec. 26, 1990.

As Modified on Denial of Rehearing
Jan. 25, 1991.

David G. Russell, Jamie Brownlee–Jordan, Parker, Hudson, Rainer & Dobbs, Atlanta, Ga., for Hutton, et al.

Charles Kipple, Saccomanno & Clegg, Clinard J. Hanby, Houston, Tex., for Grant.

Michael A. Caddell, Houston, Tex., for Haralson, RBI & IBR, Aubin, etc.

Before REAVLEY, DUHÉ and WIENER, Circuit Judges.

REAVLEY, Circuit Judge:

The E.F. Hutton Group Inc. ("Hutton Group") and its securities and commodities brokerage subsidiary, E.F. Hutton & Co. Inc. ("Hutton Company") (Hutton Group and Hutton Company collectively "Hutton") sued George J. Aubin, his wife Cameron E. Aubin, several trading companies owned by George Aubin, John B. Haralson, Caren C. Grant, IBR, Inc., and RBI, Inc. (collectively "the Aubin parties") to recover approximately $60 million under multifarious theories, including common law and securities fraud, fraudulent transfer of assets, breach of contract, tortious interference, civil conspiracy, unjust enrichment, and rescission. Hutton's allegations stem from a complex series of transactions wherein Hutton accepted the prospective proceeds from the sale of Ben Milam Savings & Loan Association ("Milam") and Mercury Savings Association ("Mercury") (collectively "the S&Ls") as security for a loan to RBI. RBI never repaid Hutton, and the Federal Home Loan Bank Board ("FHLBB") declared the S&Ls insolvent. The Aubin parties also sued Hutton, contending that Hutton was responsible for the S&Ls' conservatorship, and seeking

damages from Hutton based on usury, breach of contract, breach of fiduciary duty, tortious interference, etc. The cases were consolidated in the Southern District of Texas.

After two years of discovery battles and six days of summary judgment hearings, the district court decided the entire case on summary judgment motions. We affirm the district court's summary judgment against RBI for $58,524,128.20. We also affirm the court's summary judgment that the Aubin parties take nothing of Hutton. But because we find triable issues of fact on (1) some of Hutton's primary and secondary securities fraud claims against the Aubin parties, (2) Hutton's breach of contract claim against Haralson, (3) Hutton's tortious interference claim against Aubin, and (4) Hutton's civil conspiracy claim against Grant and Aubin, we reverse the district court's summary judgment that Hutton take nothing of the Aubin parties and remand this case for proceedings consistent with this opinion.

## I. BACKGROUND [1]

In the early 1980's, Don Sanders was Hutton Company's largest producer of trading revenues and was on its board of directors. He and John Mundy, another Hutton account executive who dealt solely with wealthy Texas individuals, worked in Houston isolated from Hutton's other Houston employees. George Aubin commonly executed multi-million dollar stock and commodity transactions through the satellite office run by Sanders and Mundy, generating millions of dollars in trading commissions annually that were split among Hutton, Sanders, and Mundy. By 1983, Sanders had been Aubin's stockbroker for over ten years and the two were good friends.

In early 1983, Haralson acquired the S&Ls. Aubin assisted Haralson, at least, in analyzing the S&Ls' business records and structuring the financing for the purchases. Later, Sanders approached the

[1]. The record reveals that in mid–1985 people on both sides of this controversy had reason to conceal the actions described below from government scrutiny. Perhaps this fear of disclosure explains why parties to this litigation incurred obligations that would not otherwise seem rational.

management of Hutton Group on behalf of the S&Ls and requested that Hutton act as agent for an undisclosed principal in purchasing the assets of two mortgage companies, Baldwin United and the Fort Wayne Mortgage Company. Although it is highly unusual for Hutton to make such purchases, it accepted the deal presented by Sanders and assigned the task to Paul J. Yang, a First Vice President in Hutton Group's merger and acquisition section. Hutton made the purchase toward the end of 1983, but both sellers sued Hutton for fraud once they found out that the S&Ls were the real purchasers. Hutton and Aubin defended a lawsuit brought by Fort Wayne's seller through mid–1985.

On September 19, 1984 the Texas Savings and Loan Department ("TS&LD") issued a cease and desist order to both Mercury and Milam, citing violations of law and unsafe and unsound lending practices. Rather than litigate the order's propriety, Haralson settled with the TS&LD and placed the S&Ls under TS&LD supervision pursuant to the "Supervisory Agreement." In two key provisions, this agreement required that Haralson divest himself of all incidences of ownership in the S&Ls within a time set by the TS&LD, and that the S&Ls terminate all business relationships with Aubin.

Sanders again went to Hutton Group's management on behalf of Aubin and Haralson, requesting that Hutton act as broker for the sale of the S&Ls. Yang was skeptical about this deal because the previous dealings with Aubin and Haralson had led to litigation. Yang also believed that the previous associations with Aubin and Haralson injured Hutton's investment banking reputation. Hutton Group's management sided with Sanders despite Yang's protests, but assigned Yang to spearhead Hutton's investment banking team for the S&Ls. Yang understood that he was to work exclusively with Aubin in selling the S&Ls and that, however inconsistent, Aubin was also trying to sell the S&Ls independent of Hutton.

Yang's team, consisting of three Hutton financial analysts with MBA degrees, gathered and reviewed data at the S&Ls' Houston offices from October 1984 to January 1985. Their efforts were often frustrated by the inaccurate information that Aubin supplied and the critical information he withheld. Even so, Yang's team compiled a two-volume offering memorandum for the S&Ls by the end of January 1985. According to Hutton, it is industry practice for investment bankers to disclaim the accuracy and completeness of such memoranda, and Hutton did so. By February 1985, Aubin identified a potential buyer by the name of Southmark Corporation.

Meanwhile, Aubin was engaged in substantial securities and commodities trading through ten corporate accounts administered by Sanders and Mundy (the "Accounts"). These three people devised a secret scheme whereby Aubin could keep trading even though he was unable to meet the margin calls on the Accounts. Day trade calls were waived unless there was a deficit position, but the positive positions were paid immediately. Aubin received prepayments of commodities gains on demand while receiving at least six extensions on the payment of due margin losses.

This scheme abruptly ended as Aubin's trading losses approached $46 million in February 1985. Sanders demanded payment of this amount, and Aubin wrote Hutton approximately 25 corporate checks between February 28 and March 4. Banks dishonored all of these checks, but not before Hutton issued $11 million in checks to Aubin for gains that occurred in some of the Accounts. Aubin deposited Hutton's checks in his corporate checking accounts at Mercury. After Mercury credited Aubin's corporate accounts, Hutton stopped payment on the checks, leaving Mercury with an $11 million loss.

Aubin executed personal guaranties on some of the Accounts. He was therefore personally liable to Hutton for approximately half of his aggregate losses in the beginning of March 1985.

## A. The Facility Agreement

On March 8, 1985, Aubin and an attorney ostensibly representing Haralson, Richard

Fuqua, went to New York to discuss the trading losses with four Hutton officials: Thomas P. Lynch, Hutton Group President and Vice-Chairman of Hutton's board of directors; Scott Pierce, President of Hutton Company; Thomas Rae, Hutton's General Counsel; and Robert Witt, Hutton's Director and Vice President of Marketing. During approximately one hour of negotiations, these parties discussed funding Aubin's trading losses with proceeds from the S&Ls' imminent sale to Southmark. Both Haralson and Aubin refused to personally guarantee repayment of any money to be advanced by Hutton through this agreement.

The day before these negotiations, the four Hutton executives contacted Yang regarding the S&Ls' value. Yang told them that he thought the S&Ls would sell for $80–100 million, but that his estimates were subject to revision after a close review of the S&Ls' loan portfolios. Yang advised Hutton's executives to secure any loan to Aubin with Haralson's stock in both S&Ls.

After the March 8 morning negotiations, Lynch and Fuqua finalized an agreement wherein Hutton Group would provide credit to correct the Accounts' deficit balances. On the evening of March 8, Haralson and Winston Woo, President of RBI, Inc. and Chief Financial Officer of the S&Ls, arrived to sign the "Facility Agreement" with Hutton's Lynch.

This agreement obligated Hutton Group to immediately advance to Hutton Company "such amounts as are necessary to satisfy existing deficiencies, if any, and margin requirements relating to [the Accounts]." Hutton Group also agreed to cause Hutton Company to honor the $11 million in checks stuck at Mercury.

Any funds that Hutton Group advanced Hutton Company under the Facility Agreement were to be repaid one year later by RBI, Inc. pursuant to a promissory note (the "Note") that RBI executed with the Facility Agreement. The Note represents RBI's unconditional promise to pay Hutton up to $60 million plus interest for funds advanced under the Facility Agreement.

RBI is a wholly-owned subsidiary of IBR, Inc., in which Haralson has a 90% controlling interest. Haralson incorporated RBI in Nevada, capitalizing it with $25,000 only two weeks before the Facility Agreement was executed. There is no evidence that RBI ever engaged in any business except assenting to the Facility Agreement.

As the other party to the Facility Agreement, Haralson promised that he was the record and beneficial owner of all of Mercury's stock and 90% of Milam's. He represented that he would remain the owner of all of Mercury's stock free of encumbrances. He delivered all of Mercury's stock to Hutton on March 8 as security for RBI's obligations under the Facility Agreement and Note. Also, upon any sale of the S&Ls, Haralson promised to immediately apply all proceeds to the amount owed Hutton on the Note. Haralson also promised to operate the S&Ls "in the ordinary course of business" until the Note was paid in full. Finally, RBI and Haralson released Hutton from any claim based on Hutton's conflict of interest arising from its positions as both investment banker and secured creditor of the S&Ls.

The Facility Agreement does not make any reference to Aubin. It does forbid all transactions in Aubin's corporate Accounts except liquidations, and mandates that all securities positions in the Accounts be substantially liquidated by March 15, 1985. No party explains why both sides flouted this provision. Instead of liquidating the Accounts, Hutton put $4 million of "seed money" in them and permitted Aubin to continue using them as commodities gambling devices. Hutton charged this seed money to RBI's Note. The parties agree that Hutton Group advanced to Hutton Company a total of approximately $48 million under the Facility Agreement and Note.

**B. The Release Agreement**

On March 11, 1985, Aubin and Haralson executed a contract wherein Haralson, on behalf of IBR, purported to release Aubin's corporations from all liability to RBI for the debt that RBI incurred on behalf of

those corporations (the "Release Agreement"). In "consideration" for the release, Aubin agreed on behalf of his Sigma Capital Corporation to assign to RBI as much of Sigma's 50% interest in the S & Ls' sale proceeds as was necessary to pay the Note. Aubin and Haralson agreed not to disclose their agreement except as required by law.

Aubin's luck turned around after the Facility Agreement restored the Accounts to equity positions. By April 10, 1985, Aubin had "earned" at least $2 million beyond the $4 million in seed money provided by Hutton. When Hutton refused to let Aubin withdraw his gains, he threatened to sue Hutton for breaching the Facility Agreement (which he contended extinguished the Account debts), bankrupt RBI, and contest Hutton's security interest in Mercury. By the end of May 1985, Aubin's gains had increased to $20 million and the parties' animosity toward one another was growing proportionately.

C. The Participation Agreements

Lynch explains that he suddenly released the Account equity balances to Aubin because "Aubin told Hutton that he was 'broke' and was 'going under' unless Hutton allowed him to withdraw equity in his trading accounts to make payroll and pay some $20 million in loans." Lynch's only condition for the release was that Haralson find someone to purchase a $4 million participation in RBI's Note from Hutton, and thus repay Hutton the seed money it had placed in the Accounts three months earlier. Aubin secured just such a participation from Guiness Mahon Trust Company by personally guaranteeing Guiness Mahon's repayment.

The deal between Hutton and Aubin was memorialized on June 7, 1985 in two contracts executed by Lynch on Hutton's behalf, Woo on RBI's behalf, and Haralson (the "Participation Agreements"). All three parties "mutually agree[d] that the Facility Agreement [and Note] remain[ed] in full force and effect." Upon receiving the $4 million from Guiness Mahon, Hutton Group surrendered all claims and liens against the Accounts and permitted Aubin to continue trading with Hutton or transfer his business to another broker at his option. Aubin traded in the Accounts until September 1985, having withdrawn approximately $49 million in equity since March 1985.

D. Collapse of the S&Ls

Southmark had signed a contract to purchase the S&Ls and paid $5.5 million of earnest money in March 1985, but this contract was contingent on Southmark's satisfaction with the S&Ls' books after closely reviewing the S&Ls' business records. Hutton knew by April 1985 that Southmark had decided not to purchase the S&Ls under its March contract. In negotiations with another potential purchaser, Yang's investment banking team described as "onerous" the conditions that Aubin demanded as part of the S&Ls' sale.

Southmark would be the S&Ls' only serious prospect. Yang tried at least through November 1985 to find a suitor for the S&Ls without success. Meanwhile, state and federal regulators assessed the S&Ls' financial viability. Besides backing sizeable loans in what was becoming a soft real estate market, the S&Ls held significant equity interests in real estate ventures with declining values. Mismanagement also figured in the S&Ls' financial decline. For example, after the Facility Agreement was executed, Haralson took home a monthly "management fee" of at least $109,000. The S&Ls' directors allowed Aubin to substitute 171 residential lots of unknown value for $4 million of collateral securing a loan to one of his companies. Only three months before they were closed by federal regulators, the S&Ls purchased luxury automobiles for eleven employees "to boost their sagging moral."[2]

Late in 1985, Lynch was obviously worried about whether Mercury's stock was sufficient security for the approximately $48 million that Hutton advanced under the Note. On several occasions, Hutton officials discussed the S&Ls with federal and

---

**2.** Freudian slip in Brief of Appellees J.B. Haralson, RBI, Inc., and IBR, Inc. at 27.

Texas regulators. Hutton ultimately received no payments on the Note and nothing for its security. On March 14, 1986, the Federal Home Loan Bank Board ("FHLBB") appointed a conservator for the S&Ls, citing dissipation of assets, insolvency, mismanagement, and unsafe and unsound lending practices. The parties then filed the claims and counterclaims at issue here.

Both sides have employed a "shotgun" approach in presenting their pleadings, motions, briefs, and arguments. To decide some 30 summary judgment motions and responses, the district court reviewed the voluminous summary judgment evidence that consisted of hundreds of exhibits and scores of lengthy depositions. The court decided that the summary judgment record conclusively determined all genuine issues of material fact as to all causes of action pleaded by Hutton as well as the Aubin parties. The court awarded Hutton Group judgment against RBI for the amount due on the Note and dismissed all other claims. Both Hutton and the Aubin parties appeal.

## II. HUTTON'S CAUSES OF ACTION

### A. Fraudulent Inducement

Using seven legal theories, Hutton maintains that its assent to the Facility Agreement was induced by any one of ten instances of Aubin-party fraudulent conduct.[3] Hutton appeals the district court's

summary dismissal of all its fraudulent inducement claims. While we agree with the district court's conclusions regarding most of Hutton's legal theories, some of Hutton's claims under section 12(2) of the 1933 Securities Act merit further consideration on remand.

### 1. State Fraud Claims

■ We agree with the district court that uncontroverted evidence determines Hutton's common law fraud, negligent misrepresentation, and Texas statutory fraud[4] claims as a matter of law. Our review of the record confirms that Hutton cannot establish elements common to these three causes of action for any alleged fraudulent conduct.

#### a. Reliance

■ To succeed in a common law fraud action, a plaintiff's reliance on the defendant's fraudulent conduct must be justifiable as well as actual. *Fredonia Broadcasting Corp. v. RCA Corp.*, 481 F.2d 781, 795 (5th Cir.1973); *Garcia v. Flynt*, 574 S.W.2d 587, 589 (Tex.Civ.App.— Houston [14th Dist] 1978), *rev'd on other grounds*, 587 S.W.2d 109 (Tex.1979); *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729, 737 (2d Cir. 1984).

"Justifiable reliance" represents a lesser burden on fraud plaintiffs than what "reasonable reliance" might imply.[5] *See gener-*

---

**3.** We will only consider the ten Aubin-party misrepresentations and omissions that Hutton complains of in its appellate briefs. Hutton has waived its fraudulent inducement claims as to all other Aubin-party misrepresentations and omissions alleged in its trial pleading. *See In re Texas Mortg. Services Corp.*, 761 F.2d 1068, 1073–74 (5th Cir.1985).

**4.** Texas imposes civil liability for false representations of material facts or material promises that are "relied on by [a plaintiff] in entering into [a real estate or stock] contract." Tex.Bus. & Com.Code Ann. § 27.01(a) (Vernon 1987). Because the statute is derived from Texas common law fraud, the reliance and materiality elements of section 27.01 do not differ from those of Texas common law fraud. *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 408 (2d Cir.1975); *see also Richardson v. Salinas*, 336 F.Supp. 997, 1000 (N.D.Tex.1972) (section 27.01 sets out the elements of common law fraud);

*Adickes v. Andreoli*, 600 S.W.2d 939, 945–46 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ dism'd w.o.j.) (applying same materiality standard to common law and section 27.01 claims). Therefore, our holdings with respect to reliance and materiality under Texas common law also apply to Hutton's claims under section 27.01.

**5.** Justifiable reliance is also an element of negligent misrepresentation. *Great Am. Mortg. Investors v. Louisville Title Ins. Co.*, 597 S.W.2d 425, 429, 432 (Tex.Civ.App.—Fort Worth 1980, ref'd n.r.e.); *Corva v. United Services Auto. Ass'n*, 108 A.D.2d 631, 485 N.Y.S.2d 264, 266 (1985); Restatement (Second) of Torts § 552(1) (1977). But because an intentional tort like fraud is not at issue, courts more readily equate unjustifiable reliance in a negligent misrepresentation context with contributory negligence. *See Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.*, 715 S.W.2d 408, 415 (Tex.App.—Dallas

*ally Dupuy v. Dupuy*, 551 F.2d 1005, 1018 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977); Restatement (Second) of Torts, §§ 545A (1977); *Prosser and Keeton on Torts*, § 108, at 750 (5th ed. 1984). To determine justifiability, courts inquire whether—given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud—it is extremely unlikely that there is actual reliance on the plaintiff's part. *See, e.g., Lone Star Machinery Corp. v. Frankel*, 564 S.W.2d 135, 139 (Tex.Civ.App.—Beaumont 1978, no writ) (specifications showed that representations were false as to house's square footage, putting plaintiff on such notice of fraud as to create a duty to make further inquiry); *General Motors Corp., Pontiac Motor Div. v. Courtesy Pontiac, Inc.*, 538 S.W.2d 3, 6 (Tex.Civ. App.—Tyler 1976, no writ) (plaintiff may not justifiably rely on "representations which any [person of normal intelligence, experience, and education] would recognize at once as preposterous ... or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth") (quoting *Prosser on Torts*, § 103, at 731 (3d ed.)); *Grumman Allied Industries*, 748 F.2d at 737 ("New York courts are particularly disinclined to entertain claims of justifiable reliance" when sophisticated plaintiff has access to information that would reveal fraud at a time when harm could be averted).

The summary judgment record conclusively establishes that Hutton could not have justifiably relied on the following allegedly fraudulent conduct in assenting to the Facility Agreement.

■ *i. Aubin's Ownership Interest in Mercury*—Hutton claims that certain Aubin parties—Aubin, Haralson, and Fuqua—hid the fact that Aubin owned a 50% interest in the proceeds from any sale of the S&Ls. Hutton shamelessly contends that

it would have sought repayment of Aubin's trading losses from this interest rather than enter into the Facility Agreement had it known that Aubin had such a claim on the S&Ls.

But Hutton's Mundy testified in his deposition that he knew from Aubin that Aubin was due even more than 50% of the proceeds from any sale of the S&Ls. Mundy testified that he told Hutton director Sanders this before the Facility Agreement was signed. The Aubin parties even discovered a tape recording of a February 1985 telephone conversation between Sanders and Mundy wherein Mundy stated that Aubin had "access" to at least 50% of the proceeds from a sale of the S&Ls.

"Because a corporation operates through individuals, the privity and knowledge of individuals at a certain level of responsibility must be deemed the privity and knowledge of the organization." *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1376 (5th Cir.1983). All Hutton executives who negotiated the Facility Agreement knew that Sanders and Mundy were the Hutton employees who knew Aubin best. If these people failed to ask Mundy what relevant information he had before assenting to the Facility Agreement, they simply did not avail themselves of knowledge which we now impute to their corporation.

*ii. Aubin's Impecuniosity*—Our holding that Hutton knew of Aubin's 50% interest in the S&Ls' sale proceeds also disposes of Hutton's claim that Aubin parties misrepresented Aubin and his companies as impecunious on March 8, 1985. We need not decide, as did the court below, whether general representations about one's personal wealth are actionable. As a matter of law, Hutton knew that Aubin had rights in substantial assets and was not induced into signing the Facility Agreement by any representation otherwise.

■ *iii. Aubin's Control of the S&Ls* —Although not in its complaint, Hutton

---

1986, writ ref'd n.r.e.); *Geosearch, Inc. v. Howell Petroleum Corp.*, 819 F.2d 521, 526 (5th Cir. 1987); *Prosser and Keeton on Torts*, § 108, at 750 (5th ed.1984). Due to the justifiability requirement's stricter nature under negligent mis-

representation than under common law fraud, a finding of unjustifiable reliance on fraudulent conduct for common law fraud purposes precludes a negligent misrepresentation claim based on the same conduct.

contends in its brief that Aubin parties defrauded Hutton by misrepresenting that Haralson controlled the S & Ls when in fact Aubin did. This is a fabricated contention. Yang testified that he believed Aubin had actual control of the S & Ls during all times relevant to this controversy. And Yang communicated this belief to his superiors.

■ *iv. Hutton's Rights in the Sale of Milam* —Hutton contends in its brief that, while negotiating the Facility Agreement, Aubin said that Hutton would have a superior interest in the sale of Milam, and that Aubin omitted telling Hutton that Aubin had a first lien on Milam's stock. The Facility Agreement obligates Haralson to pledge only Mercury's stock to Hutton. It also obligates him to take all action necessary to assign to Hutton the proceeds of either S&Ls' sale.

When the Hutton executives negotiating the Facility Agreement called Yang to get his estimate of the S&Ls' value, Yang urged them to get the stock of both Mercury and Milam as collateral. The deposition of Hutton's outside counsel, Irwin Schneiderman, indicates that Lynch's group listened to Yang. Schneiderman testified that whether Hutton would get a first lien on both Mercury and Milam or only on Mercury was negotiated on March 8, 1985. Hutton obviously lost on the issue given the Facility Agreement's language. Hutton's knowledge that it did not have a first lien on Milam means that it was not defrauded into thinking that it did.

■ *v. RBI's Assets*—Hutton claims that it was defrauded by Aubin-party representations that RBI had substantial assets when, in fact, RBI had no such assets and was formed two weeks before Haralson and Hutton signed the Facility Agreement. Hutton maintains that by asking for and receiving millions of dollars in loans, RBI's agents represented that RBI had substantial assets to meet its obligations under the Note. But Hutton's executives did not ask Aubin, Fuqua, Haralson, or anyone else about RBI's financial wherewithal before signing the Facility Agreement and lending RBI approximately $48 million. This peculiar laxity by sophisticated parties establishes an extreme unlikelihood that Hutton relied on RBI's financial strength in assenting to the Facility Agreement. Such unjustifiable reliance bars Hutton's common law fraud and negligent misrepresentation claims regarding RBI's assets as a matter of law.

■ Alternatively, we hold that Hutton waived its common law claims for fraudulent inducement based on RBI's lack of assets. In the Participation Agreements of June 7, 1985, Hutton's Lynch agreed that "the Facility Agreement and Promissory Note attached thereto dated March 8, 1985 remain in full force and effect." One month earlier, Yang wrote Lynch that, according to Aubin, "RBI has no assets." The Participation Agreements constitute Hutton's ratification of the Facility Agreement. *Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n*, 885 F.2d 266, 270 (5th Cir.1989) (ratification occurs "when a person induced by fraud to enter into an agreement continues to accept benefits under the agreement after he becomes aware of the fraud, or if he conducts himself so as to recognize the agreement as binding") (quoting *Johnson v. Smith*, 697 S.W.2d 625 (Tex.App.—Houston [14th Dist.] 1985, no writ)). "Once a contract has been ratified by the defrauded party ..., the defrauded party waives any right of rescission or damages." *Spellman v. American Universal Invest. Co.*, 687 S.W.2d 27, 29 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.) (per curiam, en banc) (quoting *Wise v. Pena*, 552 S.W.2d 196 (Tex.Civ.App.—Corpus Christi 1977, writ dism'd w.o.j.)); *cf. Bisbing v. Sterling Precision Corp.*, 34 A.D.2d 427, 312 N.Y.S.2d 305, 310 (1970) (a party who knows facts and freely recognizes a contract as existing acquiesces in it and is equitably estopped from impeaching it although it was originally void or voidable).

■ *vi. Imminence of Southmark Transaction*—Hutton claims that Aubin parties fraudulently induced Hutton's assent to the Facility Agreement by making Hutton believe that Southmark would buy the S&Ls. If Aubin, Haralson, or Fuqua

made such representations, we find reliance on them unjustifiable. Yang was involved in the negotiations to sell the S&Ls to Southmark. Yang worked full time on this project for at least ten days from the end of February 1985 to the beginning of March 1985, meeting with Southmark's president in Dallas and Southmark's counsel in New York. Yang knew that Southmark had not conducted the in-depth review of the S&Ls' financial records that is customary in the purchase of financial institutions. The Facility Agreement itself provides only that "[a] sale of Haralson's securities of Mercury and Milam is currently in the final stages of negotiation." Five days after signing the Facility Agreement, Haralson signed a sales contract with Southmark, but Southmark retained the right to walk away from the deal if it was dissatisfied after auditing the S&Ls' financial records. The record contains no evidence of Hutton's surprise at Southmark's retention of this right. Hutton did not justifiably rely on a certain Southmark purchase of the S&Ls in entering into the Facility Agreement.

 Alternatively, we hold that Hutton waived its common law claims for fraudulent inducement based on its expectation that Southmark would purchase the S&Ls. Lynch knew by April 1985 that Southmark had exercised its option to back out of its purchase contract with Haralson. Over one month later, Lynch signed the Participation Agreements on Hutton's behalf. Hutton's only response is that it did not know why Southmark had backed out. But the reasons for Southmark's withdrawal have nothing to do with the misrepresentations and omissions concerning Southmark alleged in Hutton's complaint. By ratifying the Facility Agreement after learning that Southmark would not certainly purchase the S&Ls, Hutton waived its common

law fraudulent inducement claims concerning Aubin-party representations otherwise.

 *vii. Texas Savings and Loan Department Supervision*—Hutton claims that Aubin parties concealed a formal Supervisory Agreement that Mercury entered into with the TS&LD in September 1984. Indeed, to avoid a cease and desist order, Haralson agreed with then Texas Savings and Loan Commissioner Linton Bowman III to sell the S&Ls within a year, keep Aubin out of the S&Ls' affairs, and comply with other regulatory restrictions, including loan limits and approvals by an on-site TS&LD representative.

If Hutton officials did not actually read the Supervisory Agreement before executing the Facility Agreement, the record contains abundant evidence that Hutton knew by then that something was amiss between Haralson and the TS&LD. Yang testified that he knew of "some arrangement" between the S&Ls and the TS&LD in September 1984. A September 23, 1984 memorandum by Yang reveals that he knew that Texas regulators demanded that the S&Ls be dismantled, that Haralson agreed with them to cease his involvement in the Savings and Loan business, that the state commissioner would possibly take over the S&Ls, and that state personnel were already on site at the S&Ls. A March 8, 1985 memorandum by Yang establishes his awareness that an eleven million dollar loss would cause the TS&LD to close Mercury. Yang testified that before March 8, 1985, he understood that Aubin had moved out of Mercury's office space at the insistence of the Texas regulators.

 We agree with the district court that Hutton could not have justifiably relied on the absence of regulatory problems at the S&Ls when it entered into the Facility Agreement fully aware of signs that serious problems existed.[6]

---

**6.** Alternatively, we hold that Hutton waived its common law claims for fraudulent inducement based on TS&LD supervision of the S&Ls. If Hutton officials did not actually read the Supervisory Agreement before expressly ratifying the Facility Agreement on June 7, 1985, the record contains abundant evidence that Hutton knew

by then that such an agreement existed. Hutton answered in interrogatories that it "was advised that there were formal, written Supervisory Agreements for Mercury and Milam in May 1985."

Moreover, in late May 1985, Yang telecopied to Lynch a copy of a letter written to Haralson

 *viii. S&L Loan Portfolio Condition*—Next, Hutton asserts that Aubin parties concealed significant problems in the S&Ls' loan portfolios. But both Yang and his associate, Lilian Shackleford, knew by February 1985 that another potential purchaser of the S&Ls—DBG, Inc.—was concerned about the S&Ls' acquisition, development, and construction ("ADC") loan portfolios. DBG knew that the S&Ls were not revealing important information about their ADC loans, especially the S&Ls' equity participation in some of those loans. DBG pressured Yang to get more information from the S&Ls on these loans and vowed special scrutiny of the ADC loans when it conducted its pre-purchase review of the S&Ls' financial records.

Most significant, however, is Yang's clear understanding that the S&Ls were concealing loan portfolio information that was crucial in determining the S&Ls' value. Before Hutton executed the Facility Agreement, Yang acknowledged that "anybody considering acquiring Mercury/Milam should watch out for the loan files, particularly the ADC loans." We hold that Hutton may not justifiably claim that it was defrauded by not having been told about the problematic loan portfolios because Hutton knew that Aubin kept this information from Hutton, that this information was of substantial importance, and that other potential purchasers had criticized the portfolios.

*ix. The Value of Mercury*—Next, Hutton claims that Aubin parties misrepresented that Mercury's stock was worth more than Hutton's exposure under the Facility Agreement, which was approximately $60 million.[7]

by Louis C. Gasper, Executive Vice President of the Government National Mortgage Association ("Ginnie Mae"). In this letter, Gasper threatened to end all future Ginnie Mae participation in Mercury's loans if Haralson did not remit "a letter fully disclosing the status of its compliance with the terms of the Supervisory Agreement entered into by it and the Savings and Loan Commissioner of Texas on September 25, 1984." Gasper's letter mentions the Supervisory Agreement's provision that Haralson divest himself of all incidences of ownership in Mercury and the risk that Mercury would be dissolved by

 The district court held that any Aubin-party representations as to value were opinions and therefore not actionable. *See Cravens v. Skinner,* 626 S.W.2d 173, 177 (Tex.App.—Ft. Worth 1981, no writ) (absent a confidential relationship, "a representation of market value of a commodity is merely an opinion that cannot be made the basis of recovery for fraud"). But another Texas court held that statements like "the bank is doing very well" and "it is a good, sound bank and will continue to make money" were actionable. *Wink Enterprises, Inc. v. Dow,* 491 S.W.2d 451, 453 (Tex.Civ.App.—El Paso 1973, writ ref'd n.r.e.). Federal courts have also been reluctant to hold that broad statements concerning value are opinions, and thus not actionable. *See Eisenberg v. Gagnon,* 766 F.2d 770, 775–76 (3d Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1318 (5th Cir.1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). Especially given Aubin's superior access to information concerning the S&Ls, we do not agree that his representations as to value must be disregarded as opinion. *See Wright v. Carpenter,* 579 S.W.2d 575, 580 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.) ("[r]epresentations as to matters not equally open to parties are legally statements of fact and not opinions").

 Even so, we will not ignore Hutton's knowledge of the following facts before assenting to the Facility Agreement:

—Aubin and Haralson are reputed swindlers.

the TS&LD "in light of the seriousness of the [Supervisory Agreement]."

Lynch admitted that before he signed the Participation Agreements, Yang informed him that the TS&LD had imposed a September 1985 deadline on Haralson to sell the S&Ls.

By ratifying the Facility Agreement with the knowledge cited above, Hutton waived its common law fraudulent inducement claims concerning TS&LD supervision of the S&Ls.

7. This allegation renders redundant Hutton's claim that Aubin misrepresented that the S&Ls' sale would earn over $100 million.

—Aubin twice got Hutton sued for fraud.

—Yang believed that Aubin and Haralson were out to "screw" Hutton.

—Aubin let Hutton believe that he controlled the 1100 Limited trading account that held over $25 million in equity while it was in his interest to do so and only when he owed Hutton money did he explain that Mercury controlled that account.

—The S&Ls were under the TS&LD's continuous supervision.

—The TS&LD was forcing Haralson to sell the S&Ls and get out of the savings and loan business.

—There was a strong possibility that the TS&LD would assume control of the S&Ls.

—An $11 million cash loss would cause the TS&LD to close Mercury, a business with over $5 billion in loans outstanding.

—The S&Ls held equity interests in several of their ADC "loans."

—Potential investors were skeptical about the S&Ls' loan portfolios.

—Aubin imposed "onerous" conditions on the S&Ls' sale.

—Yang believed that before taking the S&Ls as collateral, Hutton should be careful in examining the S&Ls financial records and should especially "watch out" for the ADC loan files.

We hold that Hutton's knowledge of these facts establishes that Hutton could not have justifiably relied on any Aubin-party representation as to Mercury's value.

### b. Materiality

■ Only representations of material facts are actionable under either common law fraud or negligent misrepresentation theories. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 931 (Tex.1983) (fraud); *Croce v. Croce,* 199 Misc. 635, 100 N.Y.S.2d 97, 102–03 (1950); *MBank Ft. Worth, N.A. v. Trans Meridian, Inc.,* 820 F.2d 716, 718 (5th Cir.1987) (negligent misrepresentation). In fraudulent inducement cases, the test for materiality is "whether the contract would have been signed by the plain-

tiff without such misrepresentations having been made." *Adickes v. Andreoli,* 600 S.W.2d 939, 946 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ dism'd w.o.j.).

■ *Haralson's Unencumbered Ownership of Mercury Stock*—Hutton's final claim concerns Haralson's misrepresentation in the Facility Agreement that he owned all stock in Mercury "free and clear of all liens, charges and encumbrances whatsoever." In fact, Haralson had already pledged his Mercury stock to IBR as collateral for loans totaling at least $5.8 million. On May 3, 1985, IBR assigned four Haralson promissory notes to Aubin's Sigma Capital Corporation.

These facts, even if unknown to Hutton, do not support a fraudulent inducement claim because Hutton fails to substantiate their materiality. Hutton agrees that upon receiving the Mercury stock certificates, it had a perfected first lien on Mercury's stock. *See* Tex.Bus. & Com.Code Ann. §§ 8.321, 9.305 (Vernon Supp.1991). Because Hutton cannot explain why the absence of subordinate encumbrances was material to its assent to the Facility Agreement, its common law claims based on Haralson's representation that no such encumbrances existed fail as a matter of law.

Thus, albeit on different grounds, we affirm the district court's summary dismissal of all of Hutton's common law fraud, negligent misrepresentation, and Texas Business and Commerce Code section 27.01 claims for fraudulent inducement into the Facility Agreement.

### 2. Securities Fraud Claims

Hutton also complains of the foregoing ten instances of Aubin-party conduct under various federal and state securities laws: 1) New York General Business Law, § 339–a (McKinney 1988); 2) the Texas Securities Act, Tex.Rev.Civ.Stat.Ann. art. 581–33 A(2) (Vernon Supp.1991); 3) section 12(2) of the 1933 Securities Act, 15 U.S.C. § 77*l* (2); and 4) the Security and Exchange Commission's Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated under section

10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b).

The district court's cryptic holdings regarding Hutton's securities fraud claims employ some erroneous legal principles. We dispose of those claims that can be decided as a matter of law and otherwise explain the legal principles to be applied on remand. We affirm the court's judgment against Hutton on most of its claims. Five Hutton claims under section 12(2) of the 1933 Securities Act, however, merit further consideration on remand.

#### a. New York General Business Law

██ We agree with the district court that New York General Business Law § 339–a (McKinney 1988) (making false representation of securities' value a misdemeanor) does not create a private right of action for securities fraud.

Decisions by New York's highest court construing a similar statute indicate that New York no longer recognizes a private right of action under section 339–a. *See CPC Int'l, Inc. v. McKesson Corp.,* 70 N.Y.2d 268, 519 N.Y.S.2d 804, 807, 514 N.E.2d 116, 119 (1987) (denying a private right of action under N.Y.Gen.Bus.Law § 352–c which makes fraudulent marketing of securities a misdemeanor); *Green v. Santa Fe Industries, Inc.,* 70 N.Y.2d 244, 519 N.Y.S.2d 793, 798, 514 N.E.2d 105, 110 (1987) (following *CPC* in dismissing claims under both sections 352–c and 339–a, the former expressly and the latter impliedly).

The similar scope and purpose of sections 352–c and 339–a support construing them consistently for purposes of private right of action creation. One New York court has expressly done so. *Merrill Lynch Pierce Fenner & Smith, Inc. v. Xanthoudakis,* 140 Misc.2d 595, 531 N.Y.S.2d 487,

488 (1988) (no private rights of action under sections 352–c and 339–a).[8]

#### b. Rule 10b–5

We agree with the district court that "Hutton's [Rule 10b–5] claims fail for the same reason that summary judgment is appropriate on [its common law] fraud claims." Our discussion above concerning the reliance element of common law fraud demonstrates that Hutton did not exercise the diligence due of Rule 10b–5 plaintiffs before signing the Facility Agreement. *See Dupuy,* 551 F.2d at 1020 (Rule 10b–5 plaintiff may not intentionally refuse to investigate "in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow").

██ The only Aubin-party conduct on which Hutton could have relied for common law and Rule 10b–5 purposes—Haralson's Facility Agreement representation that he owned all of Mercury's stock free of encumbrances—lacks the materiality required to support a Rule 10b–5 action. Rule 10b–5's materiality standard differs from that under common law fraud. But as explained below, Rule 10b–5 and section 12(2) share the same materiality standard, *Simpson v. Southeastern Invest. Trust,* 697 F.2d 1257, 1258 (5th Cir.1983), and Hutton's encumbrance claim fails this standard. Therefore, we agree that the district court's summary dismissal of Hutton's Rule 10b–5 claims was proper.

#### c. Section 12(2) and Article 581–33 A(2) [9]

##### i. Applicability of Securities Fraud Statutes to Private Offerings of Stock as

---

**8.** The district court's citation to *Barnes v. Peat, Marwick, Mitchell & Co.,* 69 Misc.2d 1068, 332 N.Y.S.2d 281 (1972) employs the wrong case to support its correct conclusion. *Barnes* recognized a private right of action under § 339–a, but was subsequently overruled in *CPC Int'l, Inc. v. McKesson Corp.,* 120 A.D.2d 221, 507 N.Y.S.2d 984, 992–93 (1986).

**9.** Although there are differences between Texas' article 581–33 A(2) and section 12(2), none is

material to our present discussion. The language at issue in each statute is virtually identical.

Section 12(2) imposes civil liability on anyone who

offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they

*Security for a Loan*—The Supreme Court mandates that a pledge of stock to secure a loan is equivalent to a sale for the purposes of the antifraud provisions of the federal securities laws. *Rubin v. United States,* 449 U.S. 424, 429–30, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981); *see also Marine Bank v. Weaver,* 455 U.S. 551, 554 n. 2, 102 S.Ct. 1220, 1222 n. 2, 71 L.Ed.2d 409 (1982).

▮ While the district court considered the merits of Hutton's Rule 10b–5 claim after citing *Marine Bank,* it dismissed Hutton's section 12(2) claim on the ground that section 12(2) applies only to public offerings. Hutton correctly asserts that the law is otherwise. "[E]ven if the transactions [are] isolated intrastate contracts made pursuant to private offers, the sales of securities [are] still subject to the antifraud provisions of the securities acts." *Nor–Tex Agencies, Inc. v. Jones,* 482 F.2d 1093, 1099 (5th Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 873 (1974).

Rather than remand this case for reconsideration of all of Hutton's section 12(2) claims, we will address the arguments raised by the parties on appeal. In doing so, we state the proper legal standards for the district court to apply on remand and eliminate Hutton's most spurious section 12(2) claims.

▮ *ii. Reliance*—Hutton correctly explains that section 12(2) "plaintiffs need not prove that they relied in any way on the

alleged misrepresentations or omissions." *Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680, 695 (5th Cir.1971); *cf. Wood v. Combustion Engineering, Inc.,* 643 F.2d 339, 345 (5th Cir. 1981) (reliance not required in a Texas Securities Act action). To foster a high degree of scrupulousness in the once sordid securities industry, both Congress and the Texas legislature deliberately relieved securities purchasers of the difficult burden of proving subjective reliance. L. Loss, Fundamentals of Securities Regulation, 890 (2d ed.1988); Committee on Securities and Investment Banking of the Section on Corporation, Banking and Business Law of the State Bar of Texas, Comment—1977 Amendment, *reprinted following* Tex.Rev. Civ.Stat.Ann. art. 581–33 (Vernon Supp. 1991). But other subjective elements remain under section 12(2).

▮ *iii. Actual Knowledge*—Section 12(2) and article 581–33 A(2) both bar recovery to a plaintiff who knows "of" the misstatement or omission upon which the plaintiff's securities fraud claim is based. *See* note 9, *supra.* And knowing that a misstatement or omission has been made is not the same as knowing the true fact that was misrepresented or omitted. The statutes preclude recovery whenever a plaintiff actually knows that a representation is false or knows that existing information has been withheld. *Woodward v. Wright,* 266 F.2d 108, 116 (10th Cir.1959).[10]

---

were made, not misleading (*the purchaser not knowing of such untruth or omission*)
. . .
15 U.S.C. § 77*l* (2) (emphasis added).
Article 581–33 A(2) provides a civil remedy in Texas against a person who

> offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading. . . . However, a person is not liable if he sustains the burden of proof that . . . *the buyer knew of the untruth or omission.*

Tex.Rev.Civ.Stat. Ann. art. 581–33 A(2) (Vernon Supp.1991) (emphasis added).
Indeed, the Texas Legislature amended article 581–33 A(2) in 1977 to "bring this provision closer to . . . U.S. Securities Act § 12(2)." Committee on Securities and Investment Banking of

the Section on Corporation, Banking and Business Law of the State Bar of Texas, Comment—1977 Amendment, *reprinted following* Tex.Rev. Civ.Stat.Ann. art. 581–33 (Vernon Supp.1991); *see also Salinas,* 336 F.Supp. at 1000 ("Article 581–33 is modelled after § 12(2) of the Securities Act of 1933"); *Trans Meridian, Inc.,* 820 F.2d at 725 (construing article 581–33 in accordance with fifth circuit holdings under section 12(2)). We have found no Texas authority interpreting article 581–33 A(2) that contradicts any of our holdings below with respect to section 12(2). We therefore intend our section 12(2) rulings to apply to Hutton's article 581–33 A(2) claims.

**10.** We do not suggest that a purchaser has any duty to find out the truth under section 12(2) or its Texas equivalent. Indeed, a purchaser who is actually ignorant that a seller's representation is inaccurate or incomplete may recover even

Sufficient evidence exists in the record to dispose of Hutton's section 12(2) claims as to several instances of Aubin-party conduct. We have already held that when Lynch signed the Facility Agreement on Hutton's behalf, Hutton knew that: 1) Aubin owned 50% of the S&Ls' sales proceeds; 2) Aubin had access to substantial assets; 3) Aubin controlled the S&Ls; and 4) Hutton did not get a first lien on Milam under the Facility Agreement. Hutton's section 12(2) claims based on Aubin-party misrepresentations concerning these four subjects are therefore barred.

*iv. Materiality* —There is also a subjective aspect to section 12(2)'s requirement that the facts misrepresented or omitted be "material."

> [A]n omission or misrepresentation of fact was material if, *considering its full context, including the subject matter and the relationship of the parties*, the misrepresentation or omission was of a fact which, considering [plaintiffs] as reasonable investors, would affect or influence them in determining whether to buy the [security].

*Gilbert v. Nixon*, 429 F.2d 348, 356 (10th Cir.1970) (emphasis added), *cited in Hill York*, 448 F.2d at 696. The Supreme Court considers an omitted fact material if there is a

> substantial likelihood that, *under all the circumstances*, the omitted fact would have assumed actual significance in the deliberations of the reasonable share-

holder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the *"total mix" of information made available.*

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (emphasis added). In 1988, the Supreme Court adopted its *TSC Industries* materiality standard for Rule 10b–5 actions. *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988).

Applying this standard to Hutton's fraudulent inducement claim concerning Haralson's representation that his Mercury stock was unencumbered, we hold that no reasonable jury could find a substantial likelihood that a reasonable investor would think it important that Mercury's stock was encumbered with subordinate claims. Therefore, Hutton's section 12(2) and Rule 10b–5 claims based on Haralson's misrepresentation are barred as a matter of law.

*v. Remaining Hutton Claims* —The record contains insufficient evidence for us to decide Hutton's section 12(2) claims concerning RBI's capitalization, the certainty of the Southmark transaction, the existence of a Supervisory Agreement with the TS&LD, the S&Ls' loan portfolios, and Mercury's value. Therefore, we direct the district court to consider these claims on remand.[11]

---

though the full truth is apparent from materials in her possession. *Casella v. Webb*, 883 F.2d 805, 809 (9th Cir.1989). The concept of a plaintiff's constructive knowledge has no place in section 12(2) actions.

11. The district court did not discuss Hutton's claims that the Aubin parties conspired with, and aided and abetted each other to commit securities fraud in violation of section 12(2) and Rule 10b–5. We understand the court to have presumed that a finding of primary fraud is a prerequisite to secondary liability.

Absent a finding of securities fraud, there can be no aider and abettor liability under any securities fraud statute cited by Hutton. *Abell v. Potomac Insurance Co.*, 858 F.2d 1104, 1126 (5th Cir.1988) (section 10(b)); *Pharo v. Smith*, 621 F.2d 656, 669 (5th Cir.1980) (section 12(2)); Tex. Bus. & Com.Code Ann. § 27.01(d) (Vernon

1987); Tex.Rev.Civ.Stat.Ann. art. 581–33 F(2) (Vernon Supp.1991).

Moreover, at least one member of a conspiracy must commit a primary violation before other members could be held liable under one of the statutes cited above. *See Pharo*, 621 F.2d at 668–69 (refusing to decide whether other members of a conspiracy may be liable as sellers under section 12(2) given that a primary violation is proved); *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 495 (7th Cir.1986) ("the plaintiff must show that each person alleged to be an aider, abetter, or conspirator himself committed one of the 'manipulative or deceptive' acts or otherwise met the standards of direct liability").

Because we revive some of Hutton's section 12(2) claims, the district court on remand must consider Hutton's secondary liability claims if primary violations are established.

■ That Hutton affirmed the Facility Agreement's validity on June 7, 1985 after knowing much more about the fraudulent nature of certain Aubin-party conduct than it knew before executing the Facility Agreement does not necessarily bar its section 12(2) claims for fraudulent inducement into the original contract. Both federal and Texas laws void express waivers of rights under their securities laws. 15 U.S.C. § 77n; Tex.Civ.Stat.Ann. art. 581–33 L (Vernon Supp.1991). These anti-waiver provisions void waivers of rights by subsequent conduct. *Trans Meridian, Inc.,* 820 F.2d at 726. The only way that Hutton could have waived any rights it had under section 12(2) is if the Participation Agreements are found to operate as a settlement between Hutton and the Aubin parties. *See id.* ("[w]aiver by subsequent conduct that does not take the form of a settlement is against the policy of the securities laws"); *cf. Meyers v. C & M Petroleum Producers, Inc.,* 476 F.2d 427, 429–30 (5th Cir.) (recognizing estoppel but not waiver as a defense to a section 12(2) claim), *cert. denied,* 414 U.S. 829, 94 S.Ct. 56, 38 L.Ed.2d 64 (1973). Therefore, our holdings that Hutton waived several of its common law fraudulent inducement claims by ratifying the Facility Agreement do not necessarily affect Hutton's section 12(2) claims based on the same Aubin-party conduct.

## B. Fraudulent Transfer

■ Hutton claims that RBI fraudulently transferred assets to Aubin's trading companies in contravention of Texas Business and Commerce Code § 24.03(a) (Vernon 1968).[12] The district court analyzed the Facility Agreement's "transfer [of cash] between Hutton and the accounts" and held that no fraudulent transfer occurred within the meaning of section 24.-03(a). On appeal, Hutton contends that the district court analyzed the wrong transfer.

Hutton's claim concerns the secret Release Agreement that Aubin and Haralson executed on March 11, 1985. This contract purports to bind RBI to accept any money that Aubin's Sigma Capital Corporation receives from the S&Ls' sale as its "sole and only source of repayment" for the funds that Aubin's Accounts received under the Facility Agreement. The Release Agreement effected no transfer of money; but it was intended to extinguish RBI's legal rights against Aubin's companies. Hutton explains that we should apply section 24.03(a) to RBI's forbearance of its legal rights against Aubin and his trading companies.

But despite its creativity in dreaming up its own claims, Hutton never explains what legal rights RBI had against Aubin on March 11, 1985 that RBI transferred to Aubin. Thus, even if the district court analyzed the wrong transfer, Hutton presents no evidence of another transfer. We reject Hutton's suggestion that we award a judgment against Aubin based on RBI's fraudulent transfer of unalleged, unproved rights of action, and affirm the district court's summary judgment on Hutton's fraudulent transfer claim.

## C. Trading Account Debt

Hutton assembles another litany of theories to contend that the Facility Agreement did not extinguish Aubin's Account debts.[13] We affirm the district court's summary judgment against Hutton on all such theories.

### 1. Payment And Novation

■ The district court held that "[t]he facility agreement was a novation rather than an executory accord." We disagree.

---

**12.** Section 24.03(a) provides:

A transfer by a debtor is void with respect to an existing creditor of the debtor if the transfer is not made for fair consideration, unless, in addition to the property transferred, the debtor has at the time of transfer enough property in this state subject to execution to pay all of his existing debts.

Historical Note to Tex.Bus. & Com.Code Ann. § 24.006 (Vernon 1987). *See also* Historical Note to Tex.Bus. & Com.Code Ann. § 24.007 (Vernon 1987) (subjecting only pre–1987 transfers to section 24.03(a)).

**13.** Pursuant to the Facility Agreement's terms, we apply New York law in determining the Facility Agreement's effect.

A novation contract usurps a pre-existing contract's legal effect. And "to prove a novation, there must be a 'clear and definite intention on the part of all concerned that such is the purpose of the agreement. Not only must the intention to effect a novation be clearly shown, but a novation [must] never ... be presumed.'" *Beck v. Manufacturers Hanover Trust Co.*, 125 Misc.2d 771, 481 N.Y.S.2d 211, 218 (1984). The facts cited by the district court do not establish such a clear intent as a matter of law.

■■■ But this is of no consequence to Hutton, because the Aubins, Haralson, and Aubin's trading companies assert the affirmative defense of payment in their motion for summary judgment on Hutton's account debt claims.[14] These Aubin parties claim that, in exchange for the Facility Agreement promises of RBI and Haralson, Hutton Group paid Hutton Company all amounts owing in the Accounts and this payment extinguished Aubin's corporate debts. The parties agree that after the Facility Agreement, Aubin's Accounts at Hutton Company were credited with approximately $48 million from Hutton Group, but they dispute the significance of this transfer.

■■■■ New York looks to the intentions of the payor and the creditor in determining whether a transaction constitutes payment in termination of a debt. *De Lanoy, Kipp & Swan, Inc. v. New Amsterdam Casualty Co.*, 171 Misc. 342, 11 N.Y. S.2d 625, 629 (1939), *aff'd*, 264 A.D. 713, 34 N.Y.S.2d 829 (1942), *aff'd*, 289 N.Y. 823, 47 N.E.2d 433 (1943). We hold that the following evidence establishes as a matter of law that Hutton intended that the Facility Agreement extinguish Aubin's Account debts.

Hutton Group agreed in the Facility Agreement's first paragraph that "there shall be advanced today by [Hutton] Group to [Hutton Company] such amounts as are necessary to *satisfy* existing deficiencies, if any, and margin requirements relating to [the Accounts]" (emphasis added). And "[t]he word 'pay' means to satisfy by other means than cash, as well as by cash." *Smith v. Treuthart*, 130 Misc. 394, 223 N.Y.S. 481, 483 (1927).

That Hutton understood satisfaction to be synonymous with extinction is conclusively established by Hutton's conduct after signing the Facility Agreement. Not only did Hutton Group pay Aubin's Account debts with Hutton Company, it also put a $4 million surplus in the Accounts so that Aubin could keep trading. Aubin's commodities gambling paid off. By June 1985, the Accounts held over $20 million in equity. Aubin threatened to sue Hutton for not allowing him to withdraw what he claimed to be his gains.

Hutton responded by agreeing with Haralson that in exchange for repayment of its $4 million in seed money, Hutton would release equity in excess of current requirements from the Accounts and make no claim or lien against the Accounts other than standard margin requirements. By September 1985, Hutton Company had released over $49 million in gains to Aubin from the Accounts. Hutton does not explain how these actions could possibly be consistent with an intent to hold Aubin and his trading corporations liable for the pre-March 1985 trading losses.

Based on this evidence, we affirm the district court's summary dismissal of Hutton's direct claims on the Account debts. *See Laird v. Shell Oil Co.*, 770 F.2d 508, 511 (5th Cir.1985) ("when the judgment of a district court is correct, it may be af-

---

**14.** Hutton cites Fed.R.Civ.P. 8(c) in contending that the Aubins, Haralson, and Aubin's trading companies waived the affirmative defense of payment by failing to plead it in answering Hutton's Amended Consolidated Counterclaim. But "the waiver rule is not applied automatically and as a practical matter there are numerous exceptions to it. [One is that] the substance of many unpleaded affirmative defenses may be asserted by pretrial motions, particularly in the absence of prejudice." Wright and Miller, 5 Federal Practice and Procedure, § 1278, p. 491–94 (1990); *accord Phyfer v. San Gabriel Dev. Corp.*, 884 F.2d 235, 241 (5th Cir.1989). Hutton does not claim to have been prejudiced by the assertion of a payment defense in this case almost one month before the district court held summary judgment hearings. We hold that this defense has not been waived.

firmed for reasons not given by the court and not advanced to it").

### 2. Rescission and Unjust Enrichment

■ The district court held that the remedy of equitable rescission of the Facility Agreement is unavailable to Hutton because Hutton has an adequate remedy at law: a breach of contract action against RBI for damages. We agree.

An adequate remedy at law defeats a claim for rescission under New York law. See Rudman v. Cowles Communications, Inc., 30 N.Y.2d 1, 330 N.Y.S.2d 33, 43, 280 N.E.2d 867, 874 (1972). "The adequacy of the legal remedy for damages does not depend on the collectibility of the claim." American Cities Power & Light Corp. v. Williams, 189 Misc. 829, 69 N.Y.S.2d 197, 203 (1947). Therefore, we affirm the district court's summary judgment against Hutton on its rescission claim.

■ Because the $48 million was placed in the Accounts in exchange for and pursuant to the Facility Agreement and Note, the Accounts' owners were not unjustly enriched by the transfer of funds from Hutton Group to Hutton Company. And absent unjust enrichment, we may not grant Hutton quasi-contractual relief. See Feigen v. Advance Capital Management Corp., 150 A.D.2d 281, 541 N.Y.S.2d 797 ("a non-signatory to a contract cannot be held liable [in quasi contract] where there is an express contract covering the same subject matter"), appeal dismissed, 74 N.Y.2d 874, 547 N.Y.S.2d 840, 547 N.E.2d 95 (1989). We affirm the district court's summary judgment that the Facility Agreement precludes Hutton's quasi-contractual unjust enrichment claim.

### D. Facility Agreement Subversion

Next, Hutton premises several claims on a valid and enforceable Facility Agreement.

### 1. Haralson's Breach

■ Haralson promised Hutton that "Mercury's and Milam's businesses shall be operated in ordinary course and no debts shall be incurred or other transactions entered into except in the ordinary course of business." Facility Agreement ¶ 2.h. The district court granted Haralson's conclusory motion for summary judgment on Hutton's breach of contract claim, stating that "[m]ismanagement was apparently within the S&Ls' ordinary course of business and Hutton knew this when it ratified the facility agreement."

But the Participation Agreements only reaffirmed Haralson's obligation to operate the S&Ls in the ordinary course. Even with all that Hutton knew about Aubin and Haralson by June 7, 1985, the record contains no evidence that Hutton encouraged or permitted Aubin and Haralson to lie, cheat, and steal in the ordinary course of their business. Hutton's mere awareness of a possible breach of contract claim and its failure to register disapproval are insufficient to constitute waiver or estoppel. See Union Free School Dist. v. New York State Div. of Human Rights, 43 A.D.2d 31, 349 N.Y.S.2d 757, 762 (1973), appeal dismissed, 33 N.Y.2d 975, 353 N.Y.S.2d 739, 309 N.E.2d 137 (1974).

We reject the district court's interpretation of "ordinary course," and hold that Haralson obligated himself to operate the S&Ls in accordance with the manner in which honest managers generally operate savings and loan institutions. The parties used "ordinary course" to protect Hutton's collateral while affording the S&Ls some freedom to make legitimate business mistakes. No other meaning of "ordinary course" accords with the sense of the remainder of the contract. See Laba v. Carey, 29 N.Y.2d 302, 308, 277 N.E.2d 641, 644, 327 N.Y.S.2d 613, 618 (1971) (as between possible interpretations of an allegedly ambiguous term, that will be chosen which best accords with the sense of the remainder of the contract). Even if Hutton was aware that the S&Ls were mismanaged before March 8, 1985, Haralson agreed to manage with at least the median level of competence thereafter.

■ Whether a transaction is prudent or negligent is not determinative of whether the S&Ls were run in the ordinary course. Especially in present times, com-

mission of one improper or negligent act by a savings and loan employee or agent does not necessarily distinguish the operation of one savings and loan institution from another. However, a pattern of such conduct would distinguish the S&Ls.

Hutton contends that the facts found in *Haralson v. Federal Home Loan Bank Bd.*, 721 F.Supp. 1344 (D.D.C.1989) (Haralson's unsuccessful challenge to the FHLBB's takeover of the S&Ls) establish as a matter of law that Haralson did not manage the S&Ls in the ordinary course. Though the record contains abundant evidence of a pattern of unwise, unsound, and negligent transactions, "[w]e are fundamentally a court of review, not of first analysis." *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 210 (5th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988). On remand, the district court must consider Hutton's breach of contract claims using our interpretation of "ordinary course" before we will address the matter.[15]

### 2. Tortious Interference

■■■■■ Although Aubin may incur no direct liability for breaching the Facility Agreement, as a non-party he could be liable for tortiously interfering with that Agreement. Under Texas common law, the elements of a cause of action for tortious interference with contractual relations are: (1) a contract; (2) an intentional act, calculated to cause damage to the plaintiff, that interferes with the contract; (3) such intentional act proximately causes the plaintiff actual damages; and (4) the lack of any justifiable cause or excuse on the part of the defendant. *Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275, 1298 (5th Cir.1988) (footnote omitted), *cert. denied*, 490 U.S. 1091, 109 S.Ct. 2432, 104

L.Ed.2d 988 (1989); *Deauville Corp. v. Federated Dept. Stores, Inc.*, 756 F.2d 1183, 1194 (5th Cir.1985).

■■■ The district court dismissed Hutton's tortious interference claim on several grounds, all of which we find improper. First, during summary judgment hearings the court held that, as Haralson's agent, Aubin was privileged to interfere with the Facility Agreement. But an agent is privileged to induce a principal to breach a contract only when the agent acts *qua* agent. If an agent is "motivated by *personal* animus or greed, then under Texas law, the agent can indeed be held liable for inducing his principal to breach a contract." *B. Inc. v. Miller Brewing Co.*, 663 F.2d 545, 553 (5th Cir.1981). Fact issues are raised on Aubin's inducement of a breach and the role in which he acted.

■■■ Next, the district court found that Aubin's interest in the S&Ls' sale proceeds gave him the privilege to interfere with the Facility Agreement. Aubin cites us to *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 691 (Tex.1989) ("one is privileged to interfere with another's contract ... if he has an equal or superior right in the subject matter to that of the other party"). Aubin points to his 50% interest in the S&Ls' sale proceeds as evidence of his equal interest in the Facility Agreement's subject matter. But in the March 11, 1985 Release Agreement, Aubin transferred to RBI his interest in the S&Ls' sale proceeds to the extent required to satisfy RBI's obligation to Hutton. That agreement and documents associated with the Southmark negotiations conclusively demonstrate that, according to Aubin, 50% of the S&Ls' sale proceeds amounted to approximately $50 million. These facts considered in light of

---

**15.** Haralson also promised in the Facility Agreement that on March 8, 1985, he was and would remain the owner of all Mercury stock, free of encumbrances. Furthermore, Hutton finds language in the Facility Agreement's paragraph five that could be read as obligating Haralson to remain the owner of the S&Ls' sale proceeds free of all encumbrances. Finally, Haralson represented that he was the "beneficial owner" of 100% of Mercury's stock and 90% of Milam's.

Hutton claims that Haralson breached these promises by pledging the S&Ls' stock to Aubin for loans and by granting Aubin a 50% interest in the S&Ls' sale proceeds.

The record does not indicate that the district court considered these facts in light of Hutton's properly pleaded breach of contract claim. Again, we will address these breach of contract claims only after the district court first does so.

RBI's obligations under the Facility Agreement mean that Aubin's interest amounted to no more than $2 million. This amount being significantly less than Hutton's, Haralson's, or RBI's interest in the S&Ls, Aubin may not use the equal interest privilege to defeat Hutton's tortious interference claim.

 Hutton claims that Aubin interfered with the Facility Agreement by keeping Haralson from operating the S&Ls in the ordinary course of business and by imposing conditions on the S&Ls' sale that turned buyers away. During summary judgment hearings, the district court was troubled by the fact that the Facility Agreement does not obligate RBI or Haralson to sell the S&Ls. While this fact is true,

> [i]nterference embraces within its scope all intentional invasions of contractual relations, including any act injuring or destroying property and so interfering with the performance of the contract itself, regardless of whether breach of contract is induced.

*State Nat. Bank v. Farah Mfg. Co.*, 678 S.W.2d 661, 689 (Tex.App.—El Paso 1984, writ dism'd by agr.). By preventing a sale of the S&Ls, Aubin could have intentionally interfered with RBI's ability to pay Hutton. All parties to this lawsuit understood that such prevention would proximately cause RBI to default on the Promissory Note. Therefore, we remand Hutton's claim for Aubin's tortious interference with the Facility Agreement.

*3. Conspiracy To Induce Breach*

 Caren C. Grant was a director and officer of Mercury, Milam, IBR, and RBI while the Facility Agreement was executory. Hutton asserts a claim against her and Aubin for conspiracy to induce breach of the Facility Agreement. In Texas, the elements of this civil conspiracy variant are: (1) the existence of an enforceable contract; (2) two or more non-parties' agreement to induce a party to breach a contract; (3) a party to the conspiracy commits an overt act in furtherance of the conspiratorial objective; (4) the overt act proximately causes the plaintiff actual damages; and (5) the conspirators lack justifiable excuse or privilege. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856–57 (Tex.1968); *MacDonald v. Trammell*, 351 S.W.2d 89, 92 (Tex.Civ.App.—Austin 1961), *writ dism'd w.o.j.*, 163 Tex. 352, 356 S.W.2d 143 (1962).

We understand the district court to have dismissed Hutton's conspiracy claim because Hutton produced insufficient evidence of collusive intent and conduct on Grant's part. Or, the court dismissed Hutton's claim because, as an agent of RBI and the S&Ls, Grant was privileged to interfere with the Facility Agreement. We believe that a fact issue is presented on this Hutton conspiracy claim.

 Hutton's evidence of the following raises an issue that Aubin and Grant agreed to induce Haralson and RBI to breach the Facility Agreement:

—As an officer and director of Mercury and Milam, Grant had some influence over whether the S&Ls were run in the ordinary course of business from March 8, 1985 to March 14, 1986.

—Grant received over $27,000 in gifts from Aubin between the date the Facility Agreement was signed and the date the FHLBB placed the S&Ls in conservatorship.

—When the S&Ls were insolvent, Grant voted for the S&Ls to give herself and ten other S&L employees expensive cars.

—In April 1985, Grant and other directors approved the renewal of a $1 million note from Aubin's Wichita Land & Cattle Co. The TS&LD complained to Mercury that this renewal violated the Supervisory Agreement.

—As an officer of IBR, Grant transferred liens against and stock powers of the S&Ls to Aubin's companies in exchange for loans from Aubin to Haralson.

—After a conservator was appointed for the S&Ls, Grant accepted an extremely lucrative position with Aubin's companies.

The existence of a conspiracy is usually proved with circumstantial evidence, and our assessment of the record is that Hutton has adduced enough such evidence to survive summary judgment. *See Zervas v. Faulkner*, 861 F.2d 823, 836–37 (5th Cir. 1988).

To the extent that the district court's summary judgment was premised on Grant's having agent immunity from Hutton's contract interference claim, we disagree. A jury could find that Grant, like Aubin, acted out of personal greed and therefore receives no immunity. *See B., Inc.*, 663 F.2d at 553.

During summary judgment hearings, there was some confusion as to whether it was possible for Grant, an officer and director of RBI, to interfere with RBI's promises under the Facility Agreement. Not finding any contrary authority, we hold that Grant may interfere with RBI's promises while acting in a capacity other than RBI's agent. Thus, Grant's actions as an officer and director of Mercury and Milam could further a conspiracy to induce RBI to breach the Facility Agreement and Note.

Grant tries to avoid Hutton's conspiracy claim by explaining that Hutton cannot prove whether Aubin used S&L funds to purchase her gifts. But such expensive gifts to an unrelated party could reasonably signal a *quid pro quo* regardless of where the money for them originated. Next, Grant explains that RBI could not have been induced to breach the Facility Agreement because there is no evidence that RBI engaged in any transaction other than the Facility Agreement. But actual inducement is not an element of Hutton's conspiracy claim. Grant also cites the testimony of the TS&LD official who continuously monitored the S&Ls' affairs until the FHLBB placed them under conservatorship. While the TS&LD official may not have known of any transgressions by

Grant, such ignorance is only evidence in her favor. It does not conclude Hutton's claim as a matter of law.

For these reasons, we reverse the district court's summary judgment on Hutton's claim of conspiracy to induce breach of contract and direct the court to reconsider this claim on remand.

## 4. RBI's Breach

RBI makes two attempts to avoid the district court's summary judgment on its absolute and unconditional Promissory Note in Hutton's favor for $48,072,882.51 plus interest.

First, RBI offers evidence that Hutton's Deputy Controller, Richard Carborne, did not base his affidavit establishing the amount that RBI owes Hutton on personal knowledge. *See* Fed.R.Civ.P. 56(e). But RBI admitted the amount that it owed Hutton in its trial pleading and the Participation Agreements.[16] Furthermore, Haralson admitted on deposition that Hutton advanced approximately $48 million under the Note. This evidence of the amount due Hutton on the Note supports the district court's summary judgment independent of Carborne's affidavit.

Next, RBI invokes the Uniform Commercial Code's Section 9–504 [17] to argue that Hutton may not obtain a deficiency judgment against RBI before proving proper disposition of collateral, which in this case was Mercury's stock. But RBI offers no evidence that Hutton has disposed of Mercury's stock. Hutton still has the stock certificates. We reject as frivolous RBI's contention that Hutton destroyed the stock's value by making disparaging statements about Mercury to regulators and therefore "disposed" of the stock within Section 9.504's meaning. Even if Hutton made such statements, it was Aubin and Haralson's mismanagement of the S&Ls, not Hutton's statements, that caused the FHLBB to place the S&Ls

---

16. Actually, the district court's judgment was for $60 less than RBI admitted owing Hutton in the Participation Agreements.

17. This Section requires that, *inter alia*, all aspects of collateral's disposition be commercially reasonable. Section 9–504 is adopted in Tex. Bus. & Com.Code Ann. § 9.504 (Tex. UCC) (Vernon Supp.1991) and N.Y.U.C.C.Law § 9–504.

in conservatorship. The district court's summary judgment against RBI is affirmed.

## III. AUBIN PARTY CAUSES OF ACTION

For reasons given below, we affirm the district court's summary judgment that the Aubin parties take nothing of Hutton.

### A. Usury

 As the district court held, New York General Obligation Law § 5–501(6)(b) (McKinney Supp.1988) absolutely bars RBI's usury claim. New York's legislature removed interest limits on loans of $2.5 million or more and both RBI and Haralson agreed to be bound by New York law. Because Hutton loaned more than $2.5 million under the Promissory Note, the usury claims of RBI and Haralson fail as a matter of law.

 Grant and the Aubins allege that Hutton charged them usurious interest independent of the Facility Agreement and Note. They point to Hutton's pleadings wherein Hutton sought to hold Grant and the Aubins personally liable for RBI's debts on various legal and equitable theories. The district court held that Grant could not assert a usury claim because she was not an "obligor" within the meaning of Texas' usury statute.[18]

We agree. A pleading by itself cannot make a person into an obligor under Texas' usury statute. *See Najarro v. Sasi Int'l Ltd.*, 904 F.2d 1002, 1005 (5th Cir.1990) (two of the three essential elements of a usurious transaction are a loan and an absolute obligation that the principal be repaid); *Fibergrate Corp. v. Research–Cottrell, Inc.*, 481 F.Supp. 570, 572 (N.D.Tex. 1979) (a usurious interest claim must be "rooted in a free contractual relationship between two private parties"). We affirm the district court's summary dismissal of Grant's usury claim and dismiss the Aubins' usury claims on their merits.

### B. Snitching

 Haralson and RBI claim that Hutton's agreement to sell the S&Ls for Haralson and RBI gave rise to fiduciary duties on Hutton's part. They claim that Hutton breached its brokerage agreement and its fiduciary duties by encouraging government regulators to scrutinize and ultimately take over the S&Ls. But Hutton interacted with regulators to protect its collateral under the Facility Agreement, which provides that "neither Haralson nor [RBI] shall make any claim or allegation against or with respect to Hutton ... based on any asserted conflict of interest arising out of [Hutton's broker and secured creditor] relationship[s]" to the S&Ls. Thus, pursuant to the Facility Agreement, we affirm the district court's summary dismissal of the breach of brokerage agreement and fiduciary duty claims against Hutton.

## IV. CONCLUSION

Accordingly, we affirm the district court's summary judgment against RBI on the Note for $58,524,128.20. We also affirm the court's judgment that the Aubin parties take nothing of Hutton. But we reverse the court's judgment that Hutton take nothing of George Aubin, Cameron Aubin, J.B. Haralson, Caren Grant, Richard Fuqua, ACT Properties, Sigma Capital Corp., Sigma Realty Corp., Wichita Land & Cattle Co., Wichita Equine, Inc., Wichita Corp., Kappa Development Co., NFU Investment Co., NFU Financial Co., Colwell Holding Corp., the CLW Co., RBI Realty Co., and IBR, Inc. We remand this case for further consideration of the following:

1) Hutton's primary section 12(2) claims against George Aubin, John Haralson, and Richard Fuqua and secondary section 12(2) claims against George Aubin, Cameron Aubin, J.B. Haralson, Caren Grant, Richard Fuqua, ACT Properties, Sigma Capital Corp., Sigma Realty Corp., Wichita Land & Cattle Co., Wichita Equine, Inc., Wichita

---

**18.** That statute imposes civil liability as follows: "[a]ny person who contracts for, charges or receives interest which is greater than the amount authorized by this Subtitle, shall forfeit to the obligor ..." Tex.Rev.Civ.Stat.Ann. art. 5069–1.06 (Vernon 1987).

Corp., Kappa Development Co., NFU Investment Co., NFU Financial Co., Colwell Holding Corp., the CLW Co., RBI Realty Co., IBR, Inc., and RBI, Inc. for misrepresentations and omissions concerning,

a) RBI's capitalization,

b) the certainty of the S&Ls' sale to Southmark,

c) the existence of a Supervisory Agreement with the TS&LD,

d) the S&Ls' loan portfolios, and

e) Mercury's value;

2) Hutton's claim against J.B. Haralson for breach of the Facility Agreement;

3) Hutton's claim against George Aubin for tortiously interfering with the Facility Agreement; and

4) Hutton's claim against Caren Grant and George Aubin for conspiring to induce a breach of the Facility Agreement.

AFFIRMED in part; REVERSED in part. Cause REMANDED.