**Kenneth KEASLER, Individually and as Class Representative**

v.

**NATURAL GAS PIPELINE CO. OF AMERICA.**

**Civ. A. No. M–79–13–CA.**

United States District Court, E.D. Texas, Marshall Division.

June 30, 1983.

Robert S. Blanc, Childs, Fortenbach, Beck & Guyton, Houston, Tex., Richard Anderson, Anderson & Anderson, Marshall, Tex., for plaintiffs.

Earl Sharp, Sharp, Ward, Ross, McDaniel & Starr, Longview, Tex., for intervenor.

Dennis Dylewski, John L. Verner, Calvin, Dylewski, Gibbs, Maddox & Russell, Houston, Tex., for defendant.

## MEMORANDUM OPINION AND FINAL JUDGMENT

JOE J. FISHER, District Judge.

In 1974, the Defendant, Natural Gas Pipeline Company of America (Natural) concluded a search for a natural gas storage reservoir with its decision to acquire the Rodessa-Young formation of the North Lansing field in Harrison County in east Texas. Natural purchased rights in the field and to the surface, sufficient, it claims, to give it use of the virtually depleted field as a storage reservoir.

The Plaintiffs in this class action, all having been paid by Natural for some interest, challenge the rights of Natural in the field. *Inter alia,* the Plaintiffs allege that Natural did and continues to commit conversion, taking hydrocarbons for which it did not pay. Moreover, Plaintiffs claim that such hydrocarbons and storage rights as Natural bought were obtained by fraud and deceitful misrepresentation. Plaintiffs allege violations of: section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976); S.E.C. rule 10(b)(5), 17 C.F.R. 240, 10(b)–5; the Texas fraud statute, Tex.Bus. & Com.Code, section 27.01 (Vernon 1968 & Supp.1982); and common law fraud, as well as conversion.

The court has jurisdiction of the case by virtue of 28 U.S.C. 1331 and 1332 (1976). The court certified the class in November, 1979, and the parties tried the case to the court in November, 1982.

## I. UNDERLYING FACTS

Circa 1970, Natural sought an underground storage facility near its Gulf coast trunkline. Discussions with Atlantic Richfield Co. directed Natural to the North Lansing field near an existing Natural pipeline. The field had been producing since 1941. Two formations in the field, the Rodessa-Young and the lower Petit zone, were nearly depleted. Some wells there had since ceased to produce in playing quantities, while those that remained had marginal output. No wells were expected to produce beyond 1975. Natural determined to buy the right to use the depleted formations to store pipeline gas so as to meet peak demands.

After buying the working interests from the field's operators, Natural obtained the requisite bureaucratic approval from the Texas Railroad Commission and the Federal Power Commission. As necessary, Natural secured surface rights for construction of new above-ground equipment. From every mineral owner of the proposed storage area, Natural bought "easement rights" in the formations. Moreover, Natural paid the owners of royalty interests (pursuant to still producing leases) in satisfaction of royalty expectations unfulfilled when Natural stopped production in the field. Natural apparently intended to compensate the lessors for all hydrocarbons remaining in the formations, and it appears that they accepted the payments as such. In doing so, however, Natural purchased the lessors' royalty interests, as well. Thereafter, Natural shut down production and began storing gas. At that time, the leases terminated and the reversionary rights of the mineral estate owners rematerialized.

The payments to the mineral estate owners were in proportion to the area of their respective estates. Natural paid the Dallas consulting firm of DeGolyer & McNaughton to make an independent reservoir study and estimate of volumes remaining therein. Working interest owners received payment for the volume of gas estimated to remain in their tracts, as did the lessors, as royalty interest owners.

Natural predicated payments to the lessors on: (1) the maximum lawful rate for interstate gas; (2) applied to the higher of

(a) the DeGolyer & McNaughton estimated volume, and (b) the in-house estimate of Natural. According to Natural, it paid not only for recoverable gas remaining, but non-recoverable gas, as well. Moreover, most of the royalty interest owners received a higher rate than the existing production contracts called for.

Natural contends that, in light of the imminent depletion of the field and the end to royalty income that would bring, the Plaintiffs were substantially overpaid for their interests. It appears to the court that Natural chose to make "generous" offers in order to promptly and without litigation obtain the right to store gas in the formations. Natural did not, however, reckon on the tenacity and ingenuity of the Keaslers.

## II. COMPLAINTS OF THE PLAINTIFFS

The Keaslers owned substantial acreage within the North Lansing field, and retained the mineral rights thereto. Natural negotiated with and paid them and other owners for their royalty interests, acquiring all their rights in the mineral leases then existing. Natural also bought an easement which gave it extensive rights in and to the formations. Some five years later, Plaintiffs brought this action. Plaintiffs previously alleged that they were paid too low a rate for the gas, paid for too low a volume of gas, not paid at all for "liquid hydrocarbons," and, in some cases, not paid for gas made recoverable by the storage operations. Most of these theories were later abandoned in favor of the fraud claims made in the final complaint.

The final amended complaint has two discernable components: fraud, perpetrated on all the grantors of royalty and easement agreements; and conversion, as to grantors of easements in non-producing (i.e., depleted) zones. The Plaintiffs fall into three conceivable sets:

(1) parties to easement agreements only;

(2) parties to royalty agreements only; and

(3) parties to both easement *and* royalty agreements.

As a practical matter, it appears that all members of set (2) are subsumed within set (3). The conversion claim is made only by those in the first set. The fraud claims apply to all sets above.

As noted above, two types of agreements are involved:

(1) the royalty payment agreements, wherein Natural purchased from Plaintiffs "all of their right, title, and interest in all existing oil and gas leases in the North Lansing field, Harrison County, Texas effective January 1, 1974;" and

(2) the gas storage easement agreements, wherein Natural bought the potentially perpetual right "to introduce natural gas into the Rodessa formation . . . to store . . . and retain the possession of gas . . . and to remove such gas, together with any . . . hydrocarbons, or other substances from the storage reservoir and the exclusive right . . . to use, hold and occupy the storage reservoir for all such purposes." Moreover, Plaintiffs agreed that "any gas [recovered by any reasonable method '(including water, water vapor and hydrocarbons or other substances)'] shall be considered as being the personal property of Natural."

By the terms of the complaint, it is clear that the Plaintiffs do not deny that by accepting "royalty" payments they sold Natural all their interest in outstanding leases. Neither do Plaintiffs directly challenge the extent of the conveyance made in the easement agreements by the lessors of still producing acreage. That is, Plaintiffs concede that he who signed *both* agreements conveyed all his relevant interests in the mineral estate. But parties to only the storage easement agreement, who were not paid for an interest in existing oil and gas leases because none then existed, argue that the easement agreement, standing alone, is insufficient to convey their interest in remaining (but unrecoverable) gas and hydrocarbons in place. Finally, all the Plaintiffs challenge the *legality* of both agreements, charging fraud in their inducement.

## A. CONVERSION

The Plaintiffs claim: that Natural "appropriated to its own use natural gas and

gas condensate in place belonging to [certain Plaintiffs, and] exercised complete control and dominion over the Field and all natural gas and gas condensate therein ...." Moreover, Plaintiffs assert there is "no basis in law by which [Natural] could justify its possession and use ...."

To the extent that the gas in place serves as "cushion gas" in the reservoir, it has arguably been put to "use" by Natural. Natural might also be said to "exercise complete control and dominion over the Field" and the hydrocarbons therein by virtue of its ongoing storage operations. Although the familiar phrases of dominion and control appear to apply to Natural's activities, a claim of conversion is not automatically established by their invocation.

■ Oil and gas *in place* are, by long established rules of Texas property law, a part of the realty or corpus of the land. *Texas Co. v. Daugherty,* 107 Tex. 226, 176 S.W. 717 (Tex.1915). The minerals do not become personalty until removed from the soil. *Bracewell v. Fair,* 638 S.W.2d 612 (Tex.Civ.App.1982—no writ.); *Humble Oil & Refining Co. v. West,* 508 S.W.2d 812 (Tex.1974), *cert.* denied 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 154 (1977); *W.B. Johnson Drilling Co. v. Lacy,* 336 S.W.2d 230 (Tex.Civ.App.1960—no writ.); *Stephens v. Stephens,* 292 S.W. 290 (Tex.Civ.App.1927 —writ dism'd).

■ Whereas trover lies for an unauthorized severance from land of the minerals, *Bender v. Brooks,* 103 Tex. 329, 127 S.W. 168 (Tex.1910), one cannot commit conversion of realty. *Branham v. Prewitt,* 636 S.W.2d 507 (Tex.Civ.App.1982—no writ); *Rodriguez v. Dipp,* 546 S.W.2d 655 (Tex.Civ.App.1977—writ ref'd n.r.e.). Necessarily, there can therefore be no conversion of oil and gas in place. *Choice v. Texas Co.,* 2 F.Supp. 160 (N.D.Tex.1963).

■ To prevail, Plaintiffs must prove that Natural *removed* hydrocarbons that belong to them. The court notes that this set of Plaintiffs owned non-producing, i.e., already depleted, tracts in which unrecoverable hydrocarbons remain. Into their depleted tracts Natural injects gas, stores and then removes it. The court concludes that, absent a showing that Natural has to date withdrawn more gas than it has injected, there has been no severance of gas from the realty. Plaintiffs offered no such evidence.

Plaintiffs claim, as well, that Natural removed substantial quantities of liquid hydrocarbons that belong to them. It is undisputed that liquids, including hydrocarbons, are extracted from the withdrawn storage gas following its removal from the reservoir. Natural dries the gas after, rather than before, storage in order to remove any additional water vapor and impurities that mix with the stored gas. The evidence showed that Natural pays to have the extracted condensation, including hydrocarbons, disposed of. Indeed, the extracted condensation appears to be more a liability than an asset. Nonetheless, Plaintiffs claim that Natural's "conversion" of the extracted "gas condensate" damaged them in an amount exceeding 14 million dollars.

■ Laboratory reports introduced in evidence showed that Natural derived no net gain in B.T.U. content between the gas injected and that withdrawn, further indication that Natural took nothing of value from the reservoir itself. Of course, benefit to the alleged wrongdoer is not a condition of conversion. *Fenberg v. Fenberg,* 307 S.W.2d 139 (Tex.Civ.App.1957—no writ). Rather, it is the owner's loss which is the controlling element. *Bradley v. McKinzie,* 226 S.W.2d 458 (Tex.Civ.App.1950—no writ). Assuming, *arguendo,* that Plaintiffs could show that Natural removed hydrocarbons in addition to the storage gas, to prove a loss they must first show their ownership of the minerals in place.

In determining the ownership of the minerals, the court looks to the written agreement between the parties, an agreement drawn and executed in accord with the rules governing conveyances of realty in Texas. *See, e.g., Norsworthy v. Hewgley,* 234 S.W.2d 126 (Tex.Civ.App.1950—writ ref'd); *Texas Co. v. Daugherty,* 107 Tex. 226, 176 S.W. 717 (Tex.1915).

The "Gas Storage Easement" (the Agreement), duly signed, acknowledged, and delivered, is the dispositive instrument. Interpreting the Agreement in the light least favorable to its author, Natural, the court finds that by plain language the Agreement manifests the intent of the parties to convey control of the mineral estate within the Rodessa formation. Plaintiffs unequivocally sold to Natural the right, *inter alia,* to remove not only gas, but "any water, water vapor, hydrocarbons, or other substances ..." as well. Moreover, in another clause, Plaintiffs agree that any gas which migrates beyond the reservoir—"including water, water vapor and hydrocarbons or other substances"—and is recovered by Natural, "shall be considered as being the personal property of Natural." Therefore, even assuming that which Plaintiffs did not prove: that previously unrecoverable hydrocarbons are being severed by the Natural storage process, the court finds that Plaintiffs did convey by valid contract the right to remove such substances.

The conversion complaint of Plaintiffs is without merit, amounting to little more than an attack on the adequacy of consideration paid. It is irrelevant that this set of grantors received no "royalty" payments from Natural. In exchange for such payments, the lessors conveyed only their royalty interest under existing leases. When Natural stopped production, its royalty interest terminated along with the leases. That event left all the easement grantors in the same position: possessing reversionary rights in mineral estates without mineral leases, but burdened by the gas storage easement. The court concludes that the Agreement was sufficient to convey title, of all the grantors, to any minerals removed incidental to Natural's storage operation.

## B. FRAUD

As explained above, Plaintiffs seek to recover for fraud and misrepresentation under three theories: the federal securities law, the Texas fraud statute, and the common law. While the particular elements of each theory vary somewhat, the complaint alleges common acts of misrepresentation. The court's analysis of the culpability of Natural's acts will therefore precede discussion of Plaintiffs' legal theories.

The deceitful misrepresentations upon which Plaintiffs claim to have relied fall into four sets:

(1) Not telling Plaintiffs about "likely" *future* events, to wit,

(a) "future prospects" for enhanced gas production in depleted fields;

(b) Federal Power Commission consideration of "significant increases" in interstate gas prices;

(c) the likely production of "gas condensate" from the injection and withdrawal of storage gas; and

(d) the possibility the field might produce longer than expected;

(2) Offering lump sum payments to Plaintiffs for their interests without having itemized all the crucial facts, such as,

(a) the price paid per Mcf;

(b) the volume of gas in place purchased;

(c) the methods used to estimate the minerals remaining in place; and

(d) the "real value" of the hydrocarbons being purchased;

(3) Negotiating with fraudulent or deceptive tactics, for example,

(a) styling the offer "non-negotiable" and uniform, then compromising with some, but not all, of the offerees;

(b) failing to tell all the offerees it had compromised with some;

(c) tendering a check as payment for the "gross value" of all natural gas and gas condensate in place, producible and non-producible; and

(4) Overstating the extent of the grantors' conveyances to Natural, i.e.,

(a) claiming to have bought all instead of some of the gas remaining in place;

(b) claiming to have bought condensate when it did not; and

(c) claiming to have bought the "non-recoverable gas in place" from owners of non-producing tracts.

Plaintiffs claim that had Natural shared with them all of its "knowledge" about: the field, the negotiations, the contracts, and the future, Plaintiffs would not have sold their interests.

■ Having reviewed the complaint, the record, the exhibits, and briefs filed by the parties, the court is unable to perceive any culpable acts of misrepresentation or fraud. As a general rule, fraud consists of either a false representation of a *past* or *present* material fact, or a false promise to do some *future* act. *See, e.g.,* TEX.BUS. & COM. CODE ANN. Sec. 27.01(a), (Vernon's 1968 & Supp.1982); RESTATEMENT (SECOND) OF CONTRACTS, sections 159 *et seq.* (1981); RESTATEMENT (SECOND) OF TORTS, sections 525 *et seq.* (1977).

■ The concept of fraud includes acts of nondisclosure. *Id.* at section 550. To the extent the law requires disclosure, however, it is fact, not speculation as to the future, that must be disclosed. The first set of allegations, that Natural committed fraud by failing to make predictions—about the productive life of the reservoir, regulatory acts of Congress and federal agencies, and the advancement of petroleum engineering—is bizarre in the extreme. Moreover, even had Natural been prescient, it was under no duty to share its prognostications with Plaintiffs.

The rule ... reflects the traditional ethics of bargaining between adversaries, in the absence of any special reason for application of a different rule. When the facts are patent or when the plaintiff has equal opportunity for obtaining information that he may be expected to utilize if he cares to do so, or when the defendant has no reason to think that the plaintiff is acting under a misapprehension, there is no obligation to give aid to a bargaining antagonist by disclosing what the defendant has himself discerned. To a considerable extent, sanctioned by the customs and mores of the community, superior information and better business acumen are legitimate advantages, which lead to no liability. The defendant may reasonably expect the plaintiff to make his own investigation, draw his own conclusions and protect himself; and if the plaintiff is indolent, inexperienced or ignorant, or his judgment is bad, or he does not have access to adequate information, the defendant is under no obligation to make good his deficiencies. This is true, in general, when it is the buyer of land or chattels who has the better information and fails to disclose it. Somewhat less frequently, it may be true of the seller.

*Id.* at section 551, Comment: k. The Defendant is not obliged to be a fortune teller for the Plaintiffs' benefit.

■ The second set of allegations also entail acts of nondisclosure. Plaintiffs complain that Natural's offer of a lump sum payment for the "gross value" of their royalty interests was deceitful because the factors of volume and unit price were not disclosed. The Keaslers suggest that had those factors been revealed, they would have been aware of the "real value" of the hydrocarbons in place. In other words, Natural's offer to pay certain sums for the "gross value" of minerals remaining was fraudulent because the sum offered was, Plaintiffs claim, less than the minerals' "real value." The court finds no precedent for penalizing one who offers his adversary less than the "real value" in opening negotiations. Moreover, the hidden premise of Plaintiffs argument—that the consideration was inadequate—was originally pled but later abandoned, unproven. There is no credible evidence to show that the "real value" of the rights conveyed to Natural are other than the price paid.

■ The Keaslers further assert that Natural had a duty to disclose the methodology used to estimate the volume of hydrocarbons in place. There is no evidence that Natural withheld information about its reserve estimates from anyone who inquired. Neither is there evidence that Natural based its offers on estimates known to be inaccurate. Indeed, when the estimates of

the independent consultant differed from its own, Natural based its offer on the higher of the two. Natural did the same with unit prices, paying the highest rate allowed by federal law.

This portion of the complaint appears to be nothing more than one of inadequacy of consideration—that Natural drove too hard a bargain in its negotiations with Plaintiffs—disguised as a fraud claim. It is without merit with respect to both types of transaction.

■ The third set of complaints assails the negotiating tactics of Natural as deceitful. In particular, Plaintiffs attack Natural for its pretense that the offer was "non-negotiable" when, in fact, it was open to compromise. Moreover, Plaintiffs urge that Natural had a duty, once it had negotiated or compromised with one offeree, to advise the other offerees it would do the same with them. While the representation of Natural that its offer was "non-negotiable" may have been falsely made to induce the offerees to assent, it was nonetheless a mere negotiating ploy. The representation was neither material nor basic to the transaction; in no sense were the offerees entitled to rely thereon. To determine whether Natural's offer was actually non-negotiable, the offerees had only to make a counter-offer. That some failed to do so and simply acquiesced to the offer of Natural is no ground for recovery.

■ Plaintiffs complain that Natural further defrauded the owners of depleted fields by failing to offer to buy their interest in non-existing mineral leases. This is nonsensical. In effect, this is merely another indirect attack on the adequacy of consideration. This theory simply adds a further, confusing dimension to the claim for conversion. It is similarly without merit. The court perceives no liability in fraud for not offering to buy a putative interest.

■ The fourth and final set of complaints do not even arguably fit within the bounds of fraud or misrepresentation. Plaintiffs charge that Natural "overstated" the extent of its purchase—of both royalty interests and easement rights—and thereby deceived the Plaintiffs. That is, Natural paid them for more than it actually got. This argument seems to cut against Plaintiffs. First, it assumes a breach of contract, that Natural took more than its due, which Plaintiffs have not plead or proven. Second, it appears to concede that Plaintiffs were overpaid inasmuch as they no longer directly challenge the adequacy of consideration in either type of transaction. The theory of Plaintiffs would make a grantee liable in fraud whenever he disagreed with his grantor as to the extent of the conveyance. The court finds this an absurd rule. Moreover, even if it be true that Natural claimed to have bought more rights than it did, how are Plaintiffs harmed by the discovery that they retain more rights than they thought?

■ As with other portions of their complaint, Plaintiffs here, perhaps intentionally, confuse breach of contract with fraud. The Plaintiffs' bizarre pleadings and presentation of their case forced the court to interpret the contracts in order to make findings as to the alleged acts of fraud and misrepresentation. Having done so, the court finds that Natural did lawfully purchase from the Plaintiffs: the right to occupy and use the reservoir; the right to inject gas and store it there as personal property; the right to withdraw gas and any other materials associated therewith, whether they entered with the gas or were somehow absorbed by it while in the reservoir; and the right of ownership in all such withdrawn materials, be they gaseous or liquid hydrocarbons, valuable or worthless. The court further finds that the Plaintiffs received adequate consideration for the rights conveyed to Natural. Moreover, the evidence indicates that the Plaintiffs fully intended to make such conveyances.

■ Plaintiffs altogether failed to prove that Natural made any misrepresentation or omission of material fact on which they were reasonably entitled to rely, much less that Natural "employed any device, scheme or artifice to defraud" them. It is the opinion of the court that any misstatements

by Natural made before or during the negotiations were not material or basic to the contracts. The court concludes that the Plaintiffs were not entitled to rely, if indeed they did, on any such misstatements of Natural incident to the negotiations. Accordingly, the federal securities fraud claim is without merit. *See, Simpson v. Southeastern Investment Trust,* 697 F.2d 1257 (5th Cir.1983); *Chemetron Corp. v. Business Funds, Inc.,* 682 F.2d 1149 (5th Cir.1982). Similarly groundless are the Plaintiffs' State and common law fraud claims. *See, Sawyer v. Pierce,* 580 S.W.2d 117 (Tex.Civ. App.1979—writ ref'd n.r.e.).

It is the conclusion of the court, therefore, that the Plaintiffs are not entitled to recover from the Defendant, Natural. While the court hesitates to term this lawsuit frivolous, the cause borders upon it. At the best, Plaintiffs have been disingenuous, if not ingenious. For that reason, the court orders that the costs of court be borne by the Plaintiffs, and it is, therefore

ORDERED, ADJUDGED, and DECREED that FINAL JUDGMENT be and is hereby entered for the Defendant, NATURAL GAS PIPELINE CO. OF AMERICA and that the Plaintiffs go and take nothing in this cause, paying costs of court.