**SOUTHAMPTON MINERAL
CORPORATION and Robert
A. Gray, Appellants,**

**v.**

**COASTAL OIL & GAS CORPORATION,
Appellee.**

No. C14–92–00474–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Jan. 28, 1993.

Rehearing Denied March 4, 1993.

Harvey F. Cohen, Austin, for appellants.

Don C. Nelson, Larry P. Ellsworth, Houston, for appellee.

Before JUNELL, ROBERTSON and DRAUGHN, JJ.

## OPINION

ROBERTSON, Justice.

This appeal is from an award of damages for fraud in the sale by Southampton of two mineral prospects to Coastal. Appellants bring nineteen points of error complaining of the sufficiency of evidence concerning damages, fraud, and causation. We affirm.

A brief overview of the evidence reveals that in late 1986 and early 1987 Southampton Mineral Corporation (Southampton) was in the process of acquiring two prospects—the Boldsprings Prospect and the CAB Prospect—in Polk and Tyler Counties. The Boldsprings Prospect included seismic data and oil, gas and mineral leases for approximately 6000 acres. The CAB Prospect included seismic data and options for oil, gas and mineral leases for approximately 11,000 acres. Simultaneously with Southampton's acquisition of both prospects, it was negotiating with Coastal Oil and Gas Corporation (Coastal) for the purchase by Coastal of a 50% interest in each of the prospects on a "non-promoted basis."[1] In each case Coastal agreed to pay, and did pay, Southampton 50% of what Southampton represented as its total "leasehold acquisition costs" and "seismic acquisition costs" on each of the prospects. The evidence shows that Southampton represented its "leasehold acquisition costs" and "seismic acquisition costs" of the Boldsprings Prospect to be $1,093,484.52, when, in truth, its actual costs were only $121,127.51. As to the CAB Prospect, the evidence shows that Southampton represented its total "leasehold acquisition costs" and "seismic acquisition costs" to be

$884,600.03 when, in truth, its actual costs were only $68,697.97.[2] Coastal paid 50% of the total represented costs on each prospect—$546,742.26 and $442,300.02 respectively—resulting in an overcharge of $425,614.75 for Boldsprings and $373,602.05 for CAB. Finally, there was testimony that had the Coastal representative negotiating the purchase of the two prospects known the costs represented by Southampton were not the true costs of the prospects, a recommendation would have been made that Coastal not consummate the purchase.

When Coastal became aware that it had paid more than 50% of Southampton's cost for each of the prospects, it filed suit against Southampton, Robert Gray (President of Southampton) and Lois Kidd (Director of Land Administration for Southampton). For damages, Coastal alleged:

> Southampton's actual costs for acquisition of the leases and seismic data was far below that represented to Coastal and Coastal has been damaged by an amount in excess of SEVEN HUNDRED THOUSAND AND NO/100 DOLLARS ($700,000.00) due to its reliance on the false representation of Defendants.

The case was submitted upon four questions inquiring (1) whether fraud was committed; (2) proximate cause; (3) damages and (4) exemplary damages. In Question 3, the jury was asked what sum of money would compensate Coastal "for its damages that resulted from the fraud, if any, committed upon Coastal?" In connection with the question, the trial judge instructed the jury:

> Consider the following elements of damages, if any, and none other:
>
> The difference, if any, between the value of the leases and seismic data as represented by the defendants and the value of the leases and seismic data as received by Coastal. The difference in value, if

---

1. All witnesses, including appellant Robert Gray, agreed that acquiring a lease on a non-promoted basis meant that the cost basis to the purchaser (Coastal) would be the same as the cost had been to the seller (Southampton).

2. The evidence shows that not only did Southampton overstate its leasehold acquisition costs, but Southampton also represented there were seismic acquisition costs when, in fact, Southampton had received the seismic data from its lessors at no cost.

any, shall be determined at the time of the agreements.

The jury failed to find that Lois Kidd committed fraud but found appellants liable and assessed damages at $373,602.05.

In their first four points of error appellants contend there was no evidence authorizing the submission of question number 3 on damages and no evidence to support the jury's damage finding. Citing *Leyendecker & Associates, Inc. v. Wechter*, 683 S.W.2d 369 (Tex.1984), appellants assert that Texas courts recognize two measures of damages in fraud cases. The first measure, called the "out of pocket" measure, allows an injured party to recover the difference between the value he parted with and the value he received. *Id.* at 373. The second measure, called the "benefit of the bargain" measure, allows the injured party to recover the difference between the value as represented and the actual value received. *Id.* The trial court submitted a "benefit of the bargain" measure of damages. Appellants contend that submission of this question was error because appellee presented no evidence of the value of the leases and seismic received. Alternatively, appellants claim the jury's finding is unsupported by evidence of value received. In passing upon this "no evidence" challenge, we may consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex.1990).

A brief review of the trial posture of the case is helpful to the rather "back-door" approach to the resolution of appellants' contention.

During Coastal's case in chief, Coastal relied upon the evidence showing the false representation of Southampton's *cost* as the measure of its damage. Southampton's motion for instructed verdict was overruled, but Coastal nevertheless sought to reopen "to introduce evidence necessary to the due administration of justice." The

grounds asserted by Coastal as a basis for reopening was surprise.[3] The trial judge denied appellee's motion to reopen and observed that "the evidence is not complete in this case" and "if the defendant introduces evidence, then you are entitled to rebut that."

Appellants' proof was limited by the trial judge for their failure to list witnesses and exhibits. However, one of the witnesses called by appellants was Coastal's landman, Whaley, who negotiated the purchase of the two prospects. On cross-examination he was questioned concerning the value of the Boldsprings and CAB Prospects. He testified that in an "unpromoted arrangement," "you pay your proportionate share of the incurred out-of-pocket costs and proceed" on a risk-sharing basis. He testified that the value of the leasehold interests represented by both the prospects was the amount paid for the leases because a mineral interest has "little or no value" until it is explored. He concluded, therefore, that the value of the Boldsprings Prospect and the CAB Prospect was the amount of money Southampton actually paid for the prospects. In addition to this testimony, there is the testimony of Lois Kidd, Southampton's Director of Land Acquisition, who testified on cross-examination that the value of each of the prospects was the amount of money Southampton paid to the lessors when Southampton acquired the prospects. Added to this, of course, is the testimony of Southampton's lessors that Southampton was provided the seismic without cost. We hold this is some evidence of the value of the leases and seismic as received by Coastal, and accordingly overrule appellants' first four points of error.

In their fifth and sixth points of error, appellants contend the evidence is factually insufficient to support the jury's answer to Question 3 and in their sixth point they contend the jury answer to such question is against the great weight of the evidence. In evaluating each of these challenges, we must look to and weigh all the evidence.

3. Coastal argued that because Southampton had not filed a pretrial order, as ordered by the court, Coastal was not aware of Southampton's

contention that Coastal had not properly proven its measure of damages until today when "he whips this case out."

*Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989).

We have reviewed, above, under the no evidence challenge, the evidence tending to support the answer to Question 3. In their brief appellants do not point out any evidence which *contradicts* that evidence. The only evidence we have found in the record which could arguably contradict Coastal's computation of value is the testimony of Robert Gray. He testified that he first became involved in mineral leases in Polk and Tyler counties "probably late 1984 and throughout 1985 and '86." He testified that they "purchased seismic data, some limited amount of seismic data, covering each of the two areas" and he twice testified "I think we were paying approximately $1500 per mile," but he did not offer any records to substantiate his testimony. In response to his counsel's request as to how he measured his investment, Gray testified:

> Well, we went about it two different ways. The first way was to take all of our out-of-pocket costs associated with it. And all of those costs included any direct costs we paid for acquisition of seismic, any direct costs we paid for acquisition of leases, any retainer cost we paid personnel to evaluate that, any associated direct overhead charges, any Xerox bills, any bills to Houston Blueprint Company, all of that combined. We looked at that. Then we tried to—then tried to value also the cost of the carry, and we arrived at a figure there.

Appellants appear to argue that because the evidence shows that seismic data had a value of $1,500 per mile if purchased from a third-party vendor, and as much as $6,000 to $8,000 per mile if it had to be shot for the first time, this "was consistent with Southampton's representation of its value," and therefore rendered the evidence factually insufficient because "the jury was not free to disregard the undisputed testimony that the seismic lines had a value of $1,500 per mile." We do not agree, and, accordingly overrule appellants' fifth and sixth points of error.

In their seventh point of error, appellants contend there were no pleadings to support the submission of Question 3; in their eighth point appellants contend the trial court erred in permitting Whaley to testify as to value; and in their ninth point appellants contend the trial court erred in refusing to reduce the damages awarded by the jury. These points of error have been waived because appellants offer neither argument nor authorities in support thereof. *Stevens v. Stevens*, 809 S.W.2d 512 (Tex. App.—Houston [14th Dist.] 1991, no writ).

■ In points of error ten through sixteen, which appellants group for only a general discussion, they contend that the trial court erred in entering judgment against Robert Gray because he was not a party to the contracts; that there was no evidence that Gray acted in his individual capacity; that there was no evidence or insufficient evidence of fraud; and that it was error to submit the case on a fraud claim because Coastal's only cause of action was for economic loss to the subject of the contract. These contentions are without merit.

The record contains overwhelming evidence of the fraud committed by Gray himself through his negotiations and discussions, both orally and in writing, of the prospects with representatives of Coastal. Gray directed Kidd to make the false representations concerning the costs of the prospects and Gray admitted in his testimony that he could not dispute Whaley's testimony that he (Gray) had represented certain data as being Southampton's out-of-pocket costs. The jury found Gray guilty of fraud and there was abundant evidence authorizing such submission and the jury's affirmative answer thereto.

■ We further find no merit in appellants' challenges to the jury's affirmative finding of fraud. Appellants assert that appellee alleged and proved that it paid more for the two prospects than appellants' out-of-pocket expenditure. This injury, appellants contend, constituted an economic loss recoverable where there is a breach of contract claim, but not with a claim of fraud. In support of this contention, appel-

lants cite *Hebison v. Nassau Development Company*, 754 S.W.2d 345 (Tex.App.— Houston [14th Dist.] 1988, writ denied), *Allen v. Allen*, 751 S.W.2d 567 (Tex.App.— Houston [14th Dist.] 1988, writ denied), and *Keasler v. Natural Gas Pipeline Co. of America*, 569 F.Supp. 1180 (E.D.Tex.1983); *aff'd mem.*, 741 F.2d 1380 (5th Cir.1984). We find these cases distinguishable.

In *Hebison*, the lessor sued the lessees for breach of the lease contract and for fraud. 754 S.W.2d at 346. The jury found in favor of the lessor on both claims and awarded actual and punitive damages. *Id.* On appeal, the lessees challenged the findings of fraud, the damages awarded for fraud, and the punitive damages awarded. *Id.* at 347–48. The evidence of damages for both the contract claim and the fraud claim was the lessor's loss of base rental payments, rental escalation payments, and late charges. *Id.* at 348. Although the appellate court upheld the jury's findings as to liability for fraud, the court found that the damages awarded for fraud duplicated those awarded for breach of the lease and were damages recoverable under the terms of the lease agreement, nor for fraud. *Id.*

In *Allen*, the former wife sued her ex-husband to establish her ownership in certain overriding royalty interests allegedly due under a property settlement agreement. 751 S.W.2d at 569. She also alleged fraud and conspiracy. *Id.* The evidence showed that the former wife failed to receive her one-half of the royalty benefits. *Id.* at 574. The court awarded her these payments under her contract claim. *Id.* at 570. The court also awarded her $40,-000.00 for fraud. *Id.* The former husband challenged the factual sufficiency of the evidence supporting the fraud damage award. *Id.* at 575. The evidence supporting this award consisted of the wife's testimony that her home had been posted for foreclosure, she could not pay her credit card bills, and she could not afford medical care. *Id.* at 574. The appellate court found this evidence too remote to be proximately caused by the fraud, and thus, that it constituted no evidence of damages recoverable for fraud. *Id.*

In both *Hebison* and *Allen*, the injured parties offered evidence of damages recoverable under the contract, but they failed to present any probative evidence of damages suffered solely as a result of the fraud. Appellee here, however, presented evidence of an injury resulting solely from appellants' fraud. Thus, we find *Hebison* and *Allen* inapplicable.

In *Keasler*, a gas company had purchased mineral rights and entered easement agreements with the plaintiffs so that the company could use the plaintiffs' property as a natural gas storage reservoir. 569 F.Supp. at 1182. Among other claims, the plaintiffs alleged that the lump sum payment for the "gross value" of plaintiffs' royalty interests was fraudulent because it was less than the real value of the minerals. *Id.* at 1186. The court found these fraud claims to be essentially claims of inadequate consideration, a defense not pled or proven. *Id.* Furthermore, the court noted that there is no authority for penalizing one who offers less than the real value. *Id.*

In the present case, appellants represented to appellee that they could purchase a 50% interest in the two prospects by paying half of the acquisition costs or the out-of-pocket costs. Unlike the gas company in *Keasler*, appellants made false representations to appellee as to actual value and appellee relied on these representations. Thus, we find *Keasler* inapplicable here. We overrule points ten through sixteen.

■ In their seventeenth through nineteenth points of error, appellants contend there was no evidence or insufficient evidence to support the jury's finding of proximate cause and that their affirmative finding is against the great weight of the evidence. Appellants' argument, if we understand, is that the "letter agreement" concerning the Boldsprings Prospect was signed on March 6 and, therefore, since it was an enforceable contract, the jury was precluded "as a matter of law" from considering the acts of fraud between March 6 and March 24, the date the "final agreement" was signed. We are not impressed.

**614**

The negotiations covered a period of time. It would be totally illogical to hold that because a letter of agreement was signed on March 6, any false representations made thereafter would not be admissible as evidence of the fraud committed both before and after the letter agreement was signed. There was abundant evidence of proximate cause and no evidence showing otherwise. Appellants' final points complaining of the finding of proximate cause are overruled.

The judgment is affirmed.

JUNELL, J., not participating.