IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-50525
_____


SAM R MIKHAIL, Individually and doing business as MGC
Engineering; MIKHAIL PROPERTIES; E CORPORATION,

Plaintiffs-Appellants,

v.

PHILIP F MARITZ; MARITZ WOLFF & CO,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Western District of Texas
(A-98-CV-50-JN)
_____

July 1, 1999

Before KING, Chief Judge, REYNALDO G. GARZA and JOLLY, Circuit
Judges.

PER CURIAM:[*]

Plaintiffs-appellants Sam R. Mikhail, individually and doing

business as NGC Engineering and Mikhail Properties,[1] and E

Corporation appeal the district court's grant of summary judgment

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

[1] Although the official style of the case characterizes
Mikhail Properties as a plaintiff-appellant in its own right,
Mikhail's brief describes him as "doing business as NGC
Engineering and Mikhail Properties."

on their fraud, negligent misrepresentation, and tortious interference with contract claims in favor of defendants-appellees Philip F. Maritz and Maritz Wolff & Company. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In April 1996, plaintiff-appellant Sam R. Mikhail and Lakshminarayan Srinivasan, an agent for plaintiff-appellant E Corporation, entered into a contract with Avanti Properties ("Avanti") to buy a piece of land in downtown Austin, Texas ("the Property"). The Property is part of a four-parcel development that includes the Four Seasons Hotel ("the Hotel"), which is managed by defendant-appellee Maritz Wolff & Company ("Maritz Wolff") for owner Hotel Equity Fund, L.P.; the San Jacinto Office Tower; the Shoreline Grill; and an underground parking garage connecting the Hotel and the office tower. The contract between E Corporation and Avanti provided for the expiration of a due diligence period on June 20, 1996 and the closing of the sale on or before July 1, 1996.

At the time that they contracted with Avanti, Mikhail and E Corporation intended to construct a public parking garage on the Property.[2] In early May 1996, however, after another company expressed interest in leasing 150,000 square feet of office space

---

[2] Mikhail testified at his deposition that he originally planned on building a public parking garage. Srinivasan initially testified that he could not recall whether there had been any discussion as to the public or private character of the proposed garage prior to May 14, 1996, but he later stated that he had "contemplated" constructing a public garage "[a]round April 11."

2

in downtown Austin, Mikhail and E Corporation decided to build an office tower with a private underground parking garage on the Property. On May 14, 1996, Mikhail and Srinivasan met with defendant-appellee Philip F. Maritz, a principal in Maritz Wolff; Ken Fearn, an employee of Maritz Wolff; and Craig Reid, the manager of the Hotel, in the Hotel's cocktail lounge. Mikhail and Srinivasan informed Maritz, Fearn, and Reid that E Corporation planned to build an office tower with an underground garage on the Property, showed them drawings of a building that had been planned by one of the Property's previous owners, and inquired as to Maritz Wolff's interest in participating in the development of the Property. The parties discussed developing parking, hotel rooms, condominiums, corporate apartments, and retail space on the Property, but failed to reach any agreements. On or about May 20, 1996, the company with which E Corporation had been negotiating decided against leasing office space downtown, and Mikhail and E Corporation abandoned the idea of building an office tower, focusing instead on the development of a parking garage.

On June 18, 1996, Mikhail sent the following facsimile to Maritz:

> We finalized the purchase of the property adjacent to your Four Seasons Hotel, and will be closing by the end of July. My partner and I would like to discuss these three issues with you:
>
>> . I met with Austin Commercial, who handled the construction of the Four Seasons, and have learned <u>that some of the utilities for the Four Seasons are located on our site</u>. It would be a costly

3

> proposition to relocate these utilities, but we need to discuss this further.
>
> . We need a letter of intent for the 200 parking spaces for the Four Seasons at $100.00 per month, with another 100 spaces either on a daily or an hourly basis, to be designated for the Four Seasons.
>
> . The possibility of adding 100 rooms and 50 condominiums to the hotel, as we discussed.
>
> As soon as you get this fax, please give me a call. We are looking forward to being a good neighbor to you and Four Seasons.

Maritz responded with a letter that stated in relevant part:

> In regard to the three issues you raised in your letter, you should be advised that our requirements have changed since we last met. The hotel does not have any need for additional parking spaces and is not interested in proposals to lease additional parking spaces. Due to a slowdown in the Austin economy, we see no need for either additional hotel rooms or for any condominiums and are interested in neither adding to our existing inventory nor providing service or other amenities to such units. As to the issue of utilities, I would simply suggest that you confirm the facts as our utility arrangements and easements related thereto are fully operable.

Prior to receiving this letter, however, Mikhail and E Corporation had obtained a thirty-day extension of the due diligence and closing deadlines under their contract with Avanti. In July 1996, Mikhail and E Corporation extended the contract yet again, so that the due diligence deadline became August 16, 1996 and the closing date August 30, 1996. By August 1996, however, they still had not obtained the zoning variances and permits necessary for building a public parking garage from the city of Austin. Accordingly, on August 15, 1996, plaintiffs voluntarily terminated their rights under the contract with Avanti.

During the period that Mikhail and E Corporation had the Property under contract, Lewis N. Wolff, a principal of Maritz

4

Wolff, made several inquiries as to whether it was for sale. On May 8, 1996, Wolff contacted Avanti and inquired about the status of the Property. Marvin Shapiro, an Avanti principal, informed Wolff that the Property was under contract and declined to discuss the matter further, although he did invite Wolff to call back on June 20, 1996, to see if the purchaser (whom Shapiro did not identify) had closed the sale. On June 20, 1996, the same day that Maritz sent his letter to Mikhail, Wolff contacted Avanti again to inquire about the Property. Shapiro advised Wolff that the purchasers had extended their contract, and no further discussion ensued. On August 18, 1996, after Mikhail and E Corporation canceled their contract, Wolff again contacted Avanti, and some two months later, Maritz Wolff entered into a contract to purchase the Property on behalf of the owners of the Hotel. This deal closed in December 1996.

In June 1997, Mikhail, individually and doing business as MGC Engineering and Mikhail Properties, and E Corporation (collectively, plaintiffs), brought suit against Maritz and Maritz Wolff (collectively, defendants) in state court in Dallas County, Texas for fraud, negligent misrepresentation, and tortious interference with contract. The defendants removed the action to the United States District Court for the Northern District of Texas on the basis of diversity of citizenship. That court then transferred the case sua sponte to the Western District of Texas. On February 9, 1998, the defendants filed a

5

motion for summary judgment, which the district court granted. The plaintiffs appeal.

## II.   STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, applying the same standards as the district court. See United States v. Johnson, 160 F.3d 1061, 1063 (5th Cir. 1998). After consulting applicable law in order to ascertain the material factual issues, we consider the evidence bearing on those issues, viewing the facts and the inferences to be drawn therefrom in the light most favorable to the non-movant. See Doe v. Dallas Indep. Sch. Dist., 153 F.3d 211, 214-15 (5th Cir. 1998). Summary judgment is properly granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Finally, to the extent that a district court's grant of summary judgment is based on its interpretation of state law, we review that determination de novo. See FDIC v. Abraham, 137 F.3d 264, 267 (5th Cir. 1998).

## III.   DISCUSSION

**A.   Fraud**

First, the plaintiffs contend that Maritz's allegedly false statements that the Hotel did not need additional rooms or

6

parking spaces constituted fraud.  In Texas, a plaintiff seeking to recover on a fraud claim bears the burden of proving the existence of the following: "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of the truth, which was intended to be acted upon, which was relied upon, and which caused injury."  See Johnson & Johnson Med., Inc. v. Sanchez, 924 S.W.2d 925, 929-30 (Tex. 1996) (quoting DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 688 (Tex. 1990)).  To succeed in a common law fraud action, moreover, a plaintiff's reliance on the defendant's conduct must be justifiable as well as actual.  See Haralson v. E.F. Hutton Group, Inc., 919 F.2d 1014, 1025 (5th Cir. 1990) (applying Texas law).  As a general rule, "[i]n an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests and is charged with knowledge of all facts which would have been discovered by a reasonably prudent person similarly situated.  And a failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party."  Thigpen v. Locke, 363 S.W.2d 247, 251 (Tex. 1962) (quoting Courseview, Inc. v. Phillips Petroleum Co., 312 S.W.2d 197, 205 (Tex. 1957)).  To determine whether reliance is justifiable in a particular case, courts inquire whether--given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud--it is extremely unlikely that there was actual reliance on the

7

plaintiff's part.  See Haralson, 919 F.2d at 1026 (citing Lone Star Mach. Corp. v. Frankel, 564 S.W.2d 135, 139 (Tex. Civ. App.--Beaumont 1978, no writ); General Motors Corp. v. Courtesy Pontiac, Inc., 538 S.W.2d 3, 6 (Tex. Civ. App--Tyler 1976, no writ)).

Under the circumstances in this case, any reliance plaintiffs placed on Maritz's representations as to the Hotel's needs was unreasonable as a matter of law.  At the time Maritz wrote his letter, the parties were in the earliest stages of an arms-length negotiation.  Indeed, they had spoken only once before, in the Hotel's cocktail lounge, where they briefly discussed the possibility of Maritz Wolff's participating in the development of the Property but failed to reach even a preliminary agreement.  Moreover, Maritz's representations were made in the context of terminating negotiations, a time when, we think, a reasonable businessperson would view his supposedly uninterested adversary's descriptions of his needs and wants as inherently suspicious.  In short, a party's statement that he does not wish to continue preliminary negotiations because he does not require or desire the subject of the discussions may be a mere negotiating ploy, a signal that he does not wish to do business with the other party.  Cf. Keasler v. Natural Gas Pipeline Co., 569 F. Supp. 1180, 1187 (E.D. Tex. 1983) (holding that, under Texas law, offerees were not entitled to rely on offeror's representation that its offer was "non-negotiable" because such a statement was "a mere negotiating ploy"), aff'd,

8

741 F.2d 1380 (5th Cir. 1984) (unpublished table decision);

Marburger v. Seminole Pipeline Co., 957 S.W.2d 82, 86-88 (Tex.

App.--Houston [14th Dist.] 1997, writ denied) (same).[3]  We

therefore agree with the district court that plaintiffs could not

justifiably rely on Maritz's representations.

## B.  Negligent Misrepresentation

Plaintiffs also argue that Maritz's statements constituted

negligent misrepresentation.  Under Texas law, the elements of a

claim for negligent misrepresentation are (1) a representation

made by a defendant in the course of his business, or in a

transaction in which he had a pecuniary interest; (2) the

defendant supplies "false information" for the guidance of others

in their business; (3) the defendant did not exercise reasonable

care or competence in obtaining or communicating the information;

and (4) the plaintiff suffers pecuniary loss by justifiably

---

[3]  Plaintiffs point out that the Marburger court did find
that an allegedly false representation that all offerees "had
been and necessarily would be offered the same set price" was
actionable.  957 S.W.2d at 87.  They argue that Maritz's
representation that the Hotel did not need additional parking
spaces is more akin to a statement that all offerees will receive
the same price than one that an offer is non-negotiable.  We
disagree.  The Marburger court found that the former was
actionable because offerees might reasonably infer from such a
statement that, having said so, the offeror was obligated to
offer the same price irrespective of its own willingness to
compromise with any particular offeree.  See id. at 87-88.  In
this case, however, Maritz's assertions that the Hotel did not
need additional rooms or parking spaces and was not interested in
acquiring them does not carry the same sense of obligation.
Rather, in light of the fact that they were made in the context
of terminating preliminary arms-length negotiations, these
representations were, like the statement that an offer is non-
negotiable, merely expressions of whether the speaker is willing
to compromise.

relying on the representation.  See <u>Federal Land Bank Ass'n v. Sloane</u>, 825 S.W.2d 439, 442 (Tex. 1991).  Justifiable reliance is also an element of negligent misrepresentation.  See <u>Haralson</u>, 919 F.2d at 1025 n.5 (citing <u>Great Am. Mortgage Investors v. Louisville Title Ins. Co.</u>, 597 S.W.2d 425, 429 (Tex. Civ. App.-- Fort Worth 1980, writ ref'd n.r.e.); RESTATEMENT (SECOND) OF TORTS § 552(1) (1977)).  But, this circuit has noted, because an intentional tort like fraud is not at issue, courts more readily equate unjustifiable reliance in a negligent misrepresentation context with contributory negligence.  See <u>id.</u> at 1025-26 n.5 (citing <u>Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.</u>, 715 S.W.2d 408, 415 (Tex. App.--Dallas 1986, writ ref'd n.r.e.); <u>Geosearch, Inc. v. Howell Petroleum Corp.</u>, 819 F.2d 521, 526 (5th Cir. 1987)).  Accordingly, "[d]ue to the justifiability requirement's stricter nature under negligent misrepresentation than under common law fraud, a finding of unjustifiable reliance on fraudulent conduct for common law fraud purposes precludes a negligent misrepresentation claim based on the same conduct." <u>Id.</u> at 1026 n.5.  Our conclusion in the previous section that the plaintiffs unjustifiably relied on Maritz's representations thus requires us to rule against them on their negligent misrepresentation claim as well.

## C.  Tortious Interference with Contract

Finally, plaintiffs claim that Maritz's alleged misrepresentations constituted tortious interference with their contract with Avanti.  In their appellate brief, plaintiffs argue

10

that Maritz's statements "made performance [of the contract with Avanti] more burdensome, difficult or impossible, or of less or no value," which ultimately "led Mikhail and E Corporation to terminate the contract and lose the benefit of the bargain."  In Texas, a party alleging tortious interference with a contract must prove four elements to sustain its claim: (1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred.  See ACS Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430 (Tex. 1997).  A third party's efforts to induce a contract obligor to "do what it has a right to do" is not tortious interference with contract under Texas law, however.  Id. at 430; see C.E. Servs., Inc. v. Control Data Corp., 759 F.2d 1241, 1248 (5th Cir. 1985) ("A third-party's efforts to induce another to exercise his right to dissolve a contract at will or to terminate contractual relations on notice does not constitute tortious interference with contract under Texas law.").  Viewing the evidence in the light most favorable to the plaintiffs, the defendants did no more than convince Mikhail and E Corporation to exercise what plaintiffs themselves describe as an "option to cancel the contract" with Avanti.  Under Texas law, such an action cannot form the basis of a tortious interference with contract claim.[4]

---

[4]  Plaintiffs argue that the Texas Supreme Court's holding in Sterner v. Marathon Oil Co., 767 S.W.2d 686, 689 (Tex. 1989), that "the terminable-at-will status of a contract is no defense

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

to an action for tortious interference with its performance" indicates that it has stated an actionable claim even though it had an option to cancel its contract with Avanti.  After <u>Sterner</u>, however, the Texas Supreme Court reaffirmed that while the terminable-at-will or terminable-upon-notice status of a contract does not preclude all actions for tortious interference with its performance, merely inducing one of the parties to a contract to exercise his right to terminate it does not constitute actionable interference.  <u>See</u> <u>ACS Investors</u>, 943 S.W.2d at 430 (citing <u>C.E. Servs.</u>, 759 F.2d at 1248, as direct support and noting "<u>but cf.</u>" <u>Sterner</u>).